JAMES D. ZANZIG, Plaintiff, v. H.P.M. CORPORATION *et al.*, Defendants (James D. Zanzig, Plaintiff-Appellant, v. A. J. Antunes Company, Defendant-Appellee).

First District (5th Division)    No. 83—3047

Opinion filed June 28, 1985.

618

Conrad O. Duncker, of Chicago, for appellant.

Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago (James T. Ferrini, Michael J. Carrigan, and Katherine S. Dedrick, of counsel), for appellee.

JUSTICE SULLIVAN delivered the opinion of the court:

This appeal is from summary judgment for A. J. Antunes Company (defendant) in plaintiff's personal injury action.

In his nine-count amended complaint, plaintiff alleged that he was seriously injured when molten aluminum overflowed from the die casting machine he was operating and splattered onto his legs. Counts I through VI, which were directed against the manufacturer and lessor of the machine, remain pending in the trial court and are not at issue in this appeal. Counts VII, VIII and IX sought recovery from defendant—the owner of the die—on theories of negligence, strict liability, and breach of warranty respectively, alleging essentially that defendant designed the die in question; that the die was defective and unreasonably dangerous in that it lacked a shield or other safety device to prevent the emission of molten metal from the parting line during the die casting process; that defendant distributed the die to plaintiff's employer, G & M Die Casting Company (G & M), in this unreasonably dangerous condition without providing warnings of the defect; and that plaintiff's injuries proximately resulted therefrom.

Defendant filed a motion for summary judgment which was supported by the affidavit of its president, August Antunes, in which he stated that defendant did not design, manufacture, possess, distribute, or sell the allegedly defective die. At a hearing in July 1983, the trial court granted the motion on procedural grounds, but on November 10, the July order was vacated without objection by defendant, and a hearing was conducted on the merits of its motion.

The documents presented at that hearing included excerpts from the deposition of Jerome Antunes, defendant's vice-president, who stated that defendant was in the business of manufacturing gas and air switches which he and his brother August designed; that they also designed the housing component of those switches and had submitted drawings thereof to Delta Die Casting Company (Delta), which in turn designed and manufactured the die it thereafter used to cast switch housings for defendant. The original die was manufactured in 1967, but was later modified by Delta—at his request—to increase its production capability from one to three types of housings.

In his deposition, August Antunes stated that he had not supplied Delta with any specifications for the die; however, Jerome did prepare drawings of the housing from which a sand-cast model was made for

use by Delta in designing the die. Although defendant owned the die, it remained in the possession of and was maintained by Delta until that company ceased doing business with defendant. It was then transported by Delta, per defendant's direction, to defendant's loading dock and picked up the following day by G & M, which succeeded Delta as manufacturer and supplier of defendant's housings.

Also before the trial court was the affidavit of Edward McLean, an industrial engineer, who stated therein that he had examined the die casting machine, the die, and the drawings prepared by Jerome and concluded that the die was manufactured pursuant to those drawings and "was in fact designed by the maker [thereof]."

Upon conclusion of the hearing, the trial court entered summary judgment for defendant, finding that it was not in the business of designing, manufacturing, distributing or selling dies, and thus, as a matter of law, was not liable under principles of products liability for the injuries of which plaintiff complained. Plaintiff's subsequent motion for reconsideration of that order was denied, and this appeal followed.

■■ Summary judgment is proper where the pleadings, depositions, admissions, and affidavits on file establish that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1983, ch. 110, par. 2—1005(c); *Carruthers v. B.C. Christopher & Co.* (1974), 57 Ill. 2d 376, 313 N.E.2d 457.) However, it is a drastic remedy which should be granted only where the right to it is clear and free from doubt (*Pitler v. Michael Reese Hospital* (1980), 92 Ill. App. 3d 739, 415 N.E.2d 1255), and in passing on the motion, the trial court must construe the documents presented most strongly against the moving party and most liberally in favor of the motion's opponent (*Molloy v. Santucci Construction Co.* (1979), 78 Ill. App. 3d 249, 397 N.E.2d 125). Furthermore, a reviewing court will reverse an order granting summary judgment if it is determined that a material question of fact does exist (*Connelly v. Uniroyal, Inc.* (1979), 75 Ill. 2d 393, 389 N.E.2d 155), but even where the facts are undisputed, if fair-minded persons may draw differing inferences from those facts, summary judgment cannot be granted (*Cuthbert v. Stempin* (1979), 78 Ill. App. 3d 562, 396 N.E.2d 1197).

Plaintiff first contends that summary judgment was improper as to count VIII, which was based on a theory of strict products liability, because a genuine issue of material fact existed as to whether defendant designed and/or distributed the die in question.

■■ The doctrine of strict liability, as expressed in section 402A

of the Restatement (Second) of Torts (1965) and adopted by the Illinois Supreme Court in *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182, provides:

> "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> (a) the seller is engaged in the business of selling such a product, and
>
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold."

(Restatement (Second) of Torts, sec. 402A (1965).)

The rule of strict liability in Illinois applies not only to manufacturers who sell defective products, but also to lessors (*Crowe v. Public Building Com.* (1978), 74 Ill. 2d 10, 383 N.E.2d 951), suppliers (*Connelly v. Uniroyal, Inc.* (1979), 75 Ill. 2d 393, 389 N.E.2d 155), and distributors (*Dunham v. Vaughan & Bushnell Manufacturing Co.* (1969), 42 Ill. 2d 339, 247 N.E.2d 401) thereof, and may include injuries which result from defects in design as well as in manufacture (*Wright v. Massey-Harris, Inc.* (1966), 68 Ill. App. 2d 70, 215 N.E.2d 465), but does not apply to isolated or occasional transactions (*Niffenegger v. Lakeland Construction Co.* (1981), 95 Ill. App. 3d 420, 420 N.E.2d 262; *Siemen v. Alden* (1975), 34 Ill. App. 3d 961, 341 N.E.2d 713). The major purpose of the doctrine is to impose liability for the loss caused by a defective product on those who create the risk and reap the profits by placing it in the stream of commerce, regardless of whether or not the defect resulted from the negligence of the manufacturer. *Liberty Mutual Insurance Co. v. Williams Machine & Tool Co.* (1975), 62 Ill. 2d 77, 338 N.E.2d 857.

■■ In support of his allegation that defendant designed the die at issue, plaintiff presented the deposition of Jerome Antunes, who stated that he designed and had drawings prepared of the housing component of the switches manufactured by defendant, met with the engineer at Delta prior to construction of the die from which those housings were cast, and later requested that certain alterations be made in the design of the die to accommodate modifications he had made in the design of the housing. Plaintiff also presented the drawings referred to by Jerome and the affidavit of an industrial engineer who, after examining the die, concluded that it was produced pursuant to those drawings and was in fact designed by their maker.

We note, however, that Jerome Antunes also stated, as did his brother August, that the drawings were not of the die but of the

housing defendant contracted with Delta to manufacture for it, and that both the original and modified dies were designed by Delta. August further stated that defendant submitted no specifications for the design of the die, having provided Delta with only a sand-cast model of the housing which was made from the drawings, and that although defendant owned the die, it remained in the possession of and was maintained and serviced by Delta from the time of its manufacture until—several years later—that company ceased doing business with defendant. Also before the trial court was August's affidavit in which he averred that defendant had never been in the business of designing, manufacturing, distributing, or selling this or any other die casting device.

Defendant argues that the mere preparation of drawings or a prototype of the housing manufactured by it did not constitute designing the die from which that housing was cast, and cites as support therefor the case of *Smith v. F.W.D. Corp.* (1982), 106 Ill. App. 3d 429, 436 N.E.2d 35, where, in a products liability action against it, the distributor of an allegedly defective fire truck filed a counterclaim seeking indemnity from the city of Chicago on the ground that the alleged defect—the absence of any restraining mechanisms—was the result of improper design of the truck by the city, which had not included requirements for such safety features in the plans and specifications set out in its advertisement for bids. In affirming summary judgment for the city, the *Smith* court held that the actions taken by it—as the ultimate consumer—in compiling plans and specifications for the truck, did not amount to designing it under the doctrine of strict liability in tort.

Plaintiff responds that *Smith* is factually distinguishable, and thus inapplicable, to the instant case in that the specifications submitted by the city expressly provided that the party awarded the contract was to design the truck in accordance with various Federal standards, whereas here, everything Delta needed to know in order to manufacture the die was contained in the drawings submitted to it by defendant. In our view, this distinction is not significant; indeed, if anything, the facts here are more favorable to defendant, in that the drawings at issue were not of the allegedly defective product but of the item it was intended to produce. Common sense dictates that in order to construct a die capable of casting a product of specific form and dimensions, the manufacturer must be provided with a precise pattern or description thereof from which to create his design. Contrary to plaintiff's assertion, however, it does not logically follow that design of the end product is tantamount to design of the instrumentality for which

the end product is made. There is nothing in the record before us to suggest that the drawings of the housing component included specifications regarding the external size, composition, or form of the die, or of any safety features which presumably should have been incorporated therein. The record establishes only that, like the city in *Smith,* defendant furnished Delta with certain drawings and a model of the housing for which it wanted a die manufactured. There being no dispute that the drawings and model were not of the die itself but of the component produced therefrom, we cannot say that the trial court erred in finding that defendant did not design the die in question and thus was not liable, under strict tort liability, for the injuries plaintiff allegedly suffered as a result of a defect therein.

■ Similarly, we find no error in the trial court's ruling that defendant was not strictly liable as a distributor of the allegedly defective die for purposes of strict products liability.

Although, as noted earlier, the doctrine of strict liability expressed in section 402A of the Restatement (Second) of Torts (1965) has been extended by Illinois courts to those who reap a profit by placing an unreasonably dangerous product into the stream of commerce (*Niffenegger v. Lakeland Construction Co.* (1981), 95 Ill. App. 3d 420, 420 N.E.2d 262), the plain language of the rule limits its application to those who are engaged in the business of selling or leasing such products (Restatement (Second) of Torts sec. 402A(1)(a) (1965), and excludes isolated or occasional transactions. Restatement (Second) of Torts sec. 402A(1)(a), comment f (1965); *Goetz v. Avildsen Tool & Machines, Inc.* (1980), 82 Ill. App. 3d 1054, 403 N.E.2d 555; *Luna v. Rossville Packing Co.* (1977), 54 Ill. App. 3d 290, 369 N.E.2d 612; *Siemen v. Alden* (1975), 34 Ill. App. 3d 961, 341 N.E.2d 713.

There is no evidence here that defendant was in the business of selling or leasing dies; to the contrary, the deposition statements of Jerome and August Antunes establish that defendant's business was the design and manufacture of gas and air switches. Indeed, plaintiff acknowledged, in briefing this issue, that defendant was "in the business of selling *products made from die casts.*" (Emphasis added.) He nevertheless argues that defendant owned the die and caused it to be transported to G & M as a necessary incident of a contract for the manufacture of products from which defendant reaped a profit, and therefore, under the holding in *Bainter v. Lamoine LP Gas Co.* (1974), 24 Ill. App. 3d 913, 321 N.E.2d 744, should be held strictly liable, as a distributor, for placing a defective product into the stream of commerce.

In *Bainter,* a dealer of propane gas was held liable for damages

caused when gas contained in a defective tank which it owned and installed on plaintiff's property caught fire. Recognizing that defendant was not in the business of selling gas tanks, the court nevertheless held that "the furnishing of the tank by the defendant and the use thereof by the plaintiff was an incident of the sale of the gas, and the consideration for the sale included the use of the tank." (*Bainter v. Lamoine LP Gas Co.* (1974), 24 Ill. App. 3d 913, 916, 321 N.E.2d 744, 746.) The case before us, however, does not involve the sale or lease by defendant of the die or of any other product—such as the tank in *Bainter*—of which the furnishing of the die was necessary or incidental; but, rather, the bailment of a device for use by G & M in the manufacture of a product, *i.e.* the housing component, of which *defendant* was the consumer.

Moreover, although plaintiff asserts the "distribution *** was not shown to be a singular occurrence," defendant offered testimony that this was the only die owned by it for use in the casting of its switch housings and that its transfer to G & M was a one-time consignment necessitated by Delta's refusal or inability to continue as manufacturer-supplier thereof. Since plaintiff has presented no evidence to the contrary, we conclude that this was an isolated transaction outside the scope of defendant's regular business and not within the purview of the strict liability doctrine. See *Luna v. Rossville Packing Co.* (1977), 54 Ill. App. 3d 290, 369 N.E.2d 612.

We next consider plaintiff's correlative contentions that (1) summary judgment was improperly entered as to counts VII and IX, sounding in negligence and breach of warranty respectively, because the trial court failed to consider the uncontroverted allegations, evidence and arguments relating thereto, and (2) the trial court erred in denying his motion to vacate judgment on those counts on the ground that it lacked jurisdiction to do so. In response, defendant maintains that summary judgment was proper as to all three counts against it because the basis for liability in each was the same, and, in arguments before us, expounded that in view of the trial court's determination, after a hearing on the merits, that it did not design, distribute or sell the die in question for purposes of strict liability, it cannot be held liable under the same allegations for negligence and breach of warranty; and that the motion to vacate was, therefore, properly denied.

As to the procedural history of this case, the record discloses that on July 20, 1983, the trial court granted defendant's motion for summary judgment, ruling it uncontested due to plaintiff's failure to properly file certain transcripts attached to his memorandum in opposition thereto. On August 17, after properly filing those documents, plaintiff

moved for *vacatur* of the July order. On November 10, plaintiff's motion was granted, summary judgment was vacated and a hearing on the merits of defendant's motion was then conducted, after which the trial court reentered summary judgment in defendant's favor. On December 6, plaintiff filed a motion for reconsideration of the November 10 order of summary judgment, but when the parties appeared for a hearing thereon, the trial court—apparently relying on defense counsel's representation of the November order as a denial of plaintiff's motion to vacate the July order of summary judgment—characterized it as a second motion for reconsideration of the original order of summary judgment and ruled that, due to the passage of more than 30 days from entry thereof, it lacked jurisdiction to consider it.

The general principle upon which the trial court appears to have based its ruling was enunciated in *Sears v. Sears* (1981), 85 Ill. 2d 253, 422 N.E.2d 610, where, in reviewing two consolidated cases, the supreme court stated that "a second post-judgment motion, filed more than 30 days after judgment but within 30 days of the denial of the first motion, that only repeats what was in the first motion or raises points that could have been raised the first time" is untimely and impermissible. (85 Ill. 2d 253, 258, 422 N.E.2d 610, 612.) However, unlike the situations discussed in *Sears*, the motion at issue in the instant case did not follow the *denial* of a prior post-judgment motion, *i.e.*, the August 17 motion to vacate, but rather, the *granting*—on November 10—thereof. It is well-settled that *vacatur* of an order in due time leaves the pleadings the same as if the order had never been entered. (*First National Bank v. Lambert* (1982), 109 Ill. App. 3d 177, 440 N.E.2d 306; *Talley v. Alton Box Board Co.* (1962), 37 Ill. App. 2d 137, 185 N.E.2d 349.) We therefore believe that plaintiff is correct in his argument that, since the December 6 motion to reconsider was a timely, first post-judgment motion from the November 10 order, the trial court had jurisdiction to consider it.

■■ Nevertheless, the decision of whether or not to vacate and set aside a judgment within 30 days of its entry generally rests within the sound discretion of the trial court based on the facts presented (*Conley v. People's Gas, Light & Coke Co.* (1980), 82 Ill. App. 3d 1094, 403 N.E.2d 625; *Glenner v. Chicago Transit Authority* (1972), 9 Ill. App. 3d 323, 292 N.E.2d 217), and the denial of a motion to vacate will not be reversed absent a showing of an abuse of that discretion, the test of which is whether such denial violates plaintiff's fundamental right to justice (*Chandler v. Jet Air Freight, Inc.* (1977), 54 Ill. App. 3d 1005, 370 N.E.2d 95). In this regard, our initial inquiry is whether summary judgment was properly entered in the first instance.

■ Having determined that defendant was not in the business of designing, manufacturing or distributing dies under the doctrine of strict liability, and there being no dispute that it did not sell the die in question to G & M, we see no basis for plaintiff's allegation, in count IX, that bailment of the die in its allegedly defective condition constituted a breach of an implied warranty—whether for its ordinary or a particular purpose—[1]under the implied warranty provisions of the Uniform Commercial Code (Ill. Rev. Stat. 1981, ch. 26, par. 1—101 *et seq.* (the Code), since that article specifically *governs* sales of goods (see Ill. Rev. Stat. 1981, ch. 26, par. 2—101), where the seller is a merchant with respect to goods of that kind (Ill. Rev. Stat. 1981, ch. 26, par. 2—104(1)).

Citing comment 2 following section 2—313 of the Code (Ill. Ann. Stat., Uniform Commercial Code Comment 2, at 219 (Smith-Hurd (1963)), plaintiff argues, however, that "the law in Illinois is clear and the drafters of the Uniform Commercial Code indicate *** that the warranty rules should be applied to bailments as well as sales." Initially, we note that section 2—313 deals with express—not implied—warranties, and, thus, is inapplicable to the breach of implied warranty allegations presented here.

Furthermore, contrary to plaintiff's assertion, the comment to which he refers does not indicate that the drafters of the Code intended that its provisions be applicable to all bailments, but merely states:

"[T]he warranty sections of this Article are not designed *** to disturb those lines of case law growth which have recognized that warranties need not be confined either to sales contracts or to the direct parties to such a contract. They may arise in other appropriate circumstances such as in the case of bailments for hire, whether such bailment is itself the main contract or is merely the supplying of containers under a contract for the sale of their contents. The provisions of section 2—318 on third party beneficiaries expressly recognize this case law development within one particular area. Beyond that, the matter is left to the case law with the intention that the policies of this Act may offer useful guidance in dealing with further cases as they may arise." (Ill. Ann. Stat., ch. 26, par. 2—318, Uniform Commercial

---

[1]Although the parties devote a substantial portion of their arguments on this issue to the question of whether plaintiff's complaint alleged the breach of a warranty of merchantability or fitness for a particular purpose, we believe that our analysis applies equally to either situation and, therefore, need not engage in an extended discussion regarding the specific nature of the allegations.

Code, comment 2, at 219 (Smith-Hurd 1983).)

■■ Plaintiff has not cited, nor has our research disclosed, any line of "case law growth" in this State in which the warranty provisions of the Code have been applied to a bailment such as the one here, which does not involve a bailment for hire (see, *e.g.*, *Galluccio v. Hertz Corp.* (1971), 1 Ill. App. 3d 272, 274 N.E.2d 178), the supplying of containers, as in *Bainter v. Lamoine LP Gas Co.* (1974), 24 Ill. App. 3d 913, 321 N.E.2d 744, discussed above, or injuries to persons in the family or household of a buyer to whom a warranty was made (Ill. Rev. Stat. 1981, ch. 26, par. 2—318). Moreover, we see nothing in the above language evincing an intent by the Code's drafters that this is an "appropriate circumstance" to which they should be so applied. Thus, we believe that despite the absence of specific findings by the trial court on plaintiff's allegations, in count IX, of breach of warranty, summary judgment was properly entered for defendant thereon, and that having presented nothing to indicate otherwise, plaintiff was not denied his fundamental right to justice by the trial court's denial of his motion for reconsideration thereof.

■■ ■ Contrary to defendant's position, however, it is our opinion that while count VII does not exemplify model pleading, under section 2—603(c) of the Code of Civil Procedure, which requires that "pleadings shall be liberally construed with a view to doing substantial justice between the parties" (Ill. Rev. Stat. 1981, ch. 110, par. 2—603(c)), the allegations contained therein concerning defendant's failure to furnish adequate safety devices and/or warn him of the dangers posed by the die in its allegedly defective condition alleged negligence on grounds distinct from those on which the strict liability charge was predicated. Indeed, in filing its motion for summary judgment, defendant conceded the sufficiency of the complaint (*Nolan v. Johns-Manville Asbestos & Magnesia Materials Co.* (1979), 74 Ill. App. 3d 778, 392 N.E.2d 1352), and has stated in its brief that there are no issues raised as to the pleadings.

■■ In addition, plaintiff presented evidence establishing that defendant not only owned the die in question but also, as bailor thereof, ordered it shipped from Delta to its loading dock where the die remained, albeit for a short period, until it was picked up by G & M to be used thereby—as Delta's successor-bailee—for the manufacture of defendant's housing switches; and although plaintiff argued in his memoranda and at the hearing that by ordering and directing this transfer defendant had "distributed" the die for use in furtherance of its business interests and was, therefore, liable under the rules governing the liability of business bailors, numerous comments by the trial

court indicate that it considered the question of distribution only as that term is defined within the context of strict products liability. In fact, in granting defendant's motion, the court specifically stated that because "the facts are undisputed that defendant [is] not in the business of selling, distributing [or] manufacturing dies for the purpose of distribution for sale to the ultimate consumer, *** I cannot see how this could be covered in a products liability situation. Accordingly, *on that basis,* I would find as a matter of law that defendant is entitled to summary judgment." Thus, since it appears that the trial court did not consider the law relating to liability for negligence of business bailors (see *Huckabee v. Bell & Howell, Inc.* (1970), 47 Ill. 2d 153, 265 N.E.2d 164; Restatement (Second) of Torts sec. 392 (1965)), or the applicability, if any, of that law to the allegations in count VII of plaintiff's complaint, we conclude that summary judgment as to that count was, at best, premature, and that plaintiff was entitled to a hearing on his arguments for reconsideration thereof.

Accordingly, we affirm that portion of the order of the trial court granting defendant's motion for summary judgment on counts VIII and IX, but reverse that portion entering summary judgment on count VII and remand this cause for further proceedings not inconsistent with the views expressed herein.

Affirmed in part; reversed in part; remanded for further proceedings.

MEJDA, P.J., and PINCHAM, J., concur.