[No. B026086. Second Dist., Div. Four. June 6, 1989.]

NICHOLE FORTMAN, Plaintiff and Respondent, v.
HEMCO, INC., Defendant and Appellant.

246

**COUNSEL**

Moser & Conway, Lascher & Lascher and Edward L. Lascher for Defendant and Appellant.

Hurley, Grassini & Wrinkle and Roland Wrinkle for Plaintiff and Respondent.

**OPINION**

**WOODS (A. M.), P. J.**—Nichole Fortman, a minor, sustained permanent and extensive injuries when she was ejected from her parents' jeep after inadvertently unlatching the passenger door while the car was in operation. The door, which was rear-hinged and front opening, caught the wind and flew open ejecting Nichole, who had snagged her sleeve on the door handle. She fell to the street and was run over by another vehicle.

In her lawsuit Nichole alleged that the jeep door was defective by reason of being rear hinged and front opening and because of its use of exposed

door handles. The door was part of a fiberglass jeep top sold to jeep owners as an after-market product.[1]

The idea of the fiberglass jeep top was conceived by John Redford. Because he lacked the training to turn his idea into a product, Redford sought advice from Jim Greene, owner of Wild Child Custom Shop, an auto body shop, and Ronald Hill, a trained engineer and president of Hemco, Inc., a company that made fiberglass molds and cast products. Redford received advice from Greene and Hill while working out the feasibility of the design for the jeep top. Greene made the prototype from which the mold was made. Hemco made the mold and actually cast two tops, one for Redford's use. Redford rejected Hemco's bid for the right to produce the tops.

Hemco was one of several defendants named in Nichole's action and the only defendant who refused to settle. A jury awarded Nichole $23,742,620 and found Hemco to be 25 percent responsible for her injuries. Hemco appeals. We affirm.

The facts are that John Redford wanted a fiberglass top for his jeep and decided that the only way he could afford one was to produce them commercially. He first talked to Ronald Hill in the fall of 1975. He was looking for someone "in the business of making fiberglass components, finished products in the automotive business." Hill's company, Hemco, was in the business. One of their clients was the Kenworth Truck Company for whom Hemco made truck cabs.

At their initial meeting, Redford showed Hill a sketch of his jeep top concept and asked Hill whether Hemco would be interested in building it. At a second meeting, Redford showed Hill more refined drawings and asked him specific questions as, for example, whether Hemco had sources for hardware and windows. Hill took Redford through Hemco's plant and showed him examples of prototypes being built by Hemco including that of a Kenworth cab. Hill showed an active interest in the jeep top and a willingness to cooperate with Redford and Greene.

Jim Greene set out to build a wooden prototype of the jeep top from which Hemco could make a fiberglass mold. The mold in turn would be used to cast the actual parts of the jeep top.[2] While the prototype was being built, there were meetings at both Wild Child and Hemco "to obtain a

---

[1] The Fortmans had purchased their jeep secondhand from a private party.

[2] At trial, Nichole's expert, Cory Gray, testified that no fiberglass product can be manufactured without a mold having been made.

Although the mold apparently consisted of a number of separate parts, the parties refer to it in the singular, as do we, for consistency.

consensus of opinion about how the wood should be built so that [it] would [be] something that Hemco could make a mold of." Hill and Greene assisted Redford in "all aspects of the design" of the jeep top.

The design incorporated rear-hinged, forward-opening doors that used nonrecessed "hook" handles. Redford consulted Hill about various issues related to the door. Hill, for example, felt the lock Redford wanted to use was unnecessarily expensive. Hill was not consulted on the placement of the door hinge. Hill did say that he saw the market appeal of a rear-hinged door and thought the design outstanding.

Hemco made a mold from Greene's prototype which Hill had revised and edited. In addition to making the mold, Hemco actually cast two jeep tops from the mold, one of which Redford used for his own jeep. Hill also gave Redford an estimate for the cost of producing the tops from the mold. Redford, however, was dissatisfied with both the quality of the tops Hemco produced and Hemco's cost estimate and went to a company called Rigid Forms, Inc., to have the tops produced. Hemco was paid about $2,500 for making the mold.

Initially, Rigid Forms used the Hemco mold to produce the jeep tops. Later, the number of pieces for the mold was reduced from 12 to 8. However, there were no changes made by Rigid Forms on the Hemco mold for the doors. Unchanged, the door mold was used for the entire period the jeep tops were produced by Rigid Forms. Every door produced by the mold was identical to the mold.

One of the jeep tops cast from the Hemco mold was attached to the jeep eventually purchased by Richard Fortman. On November 13, 1981, Debra Fortman used the jeep to drive to and from the bank. With her was her three-year-old daughter, Nichole. At the bank, one of the tellers gave Nichole a booklet to play with. During the drive home from the bank, Nichole dropped the booklet and asked her mother for permission to pick it up. Nichole was not wearing a seatbelt. Her mother told her to get the booklet and then to sit back down. Mrs. Fortman saw Nichole standing in the area of the front door. She then saw Nichole's arm next to the door and heard Nichole yell " 'Mommie.' " The door blew open and she saw Nichole hanging on the door as if she was holding on or hooked. Nichole fell to the street below, and was run over by a car in the next lane which was a few feet behind the jeep.[3]

As the accident was later reconstructed, Nichole apparently pulled herself forward from her seat to a standing position on the floor by grasping the

---

[3] Evidence of Nichole's injuries is set forth under our discussion of damages.

door handle. As she stood, she pressed the handle down, releasing the door latch. The door caught the wind and began to open. Nichole snagged her shirtsleeve on the handle and was thrown out of the car.

Nichole brought an action against numerous defendants. Nichole alleged causes of action in strict liability and negligence against Hemco. By the time the action went to trial, settlements had reduced the defendants to Hemco and Austin Hardware & Supply, Inc. Nichole dismissed her negligence cause of action against Hemco. Mrs. Fortman dismissed her cause of action for negligent infliction of emotional distress, removing her as a plaintiff from the case. Thus, as against Hemco, the trial proceeded solely on a strict liability theory.[4]

The only expert put on by either side regarding the defective door and Hemco's role in its production was Cory Gray, an engineer specializing in accident analysis.

On the issue of defect, Gray testified that rear-hinged, front-opening doors had been recognized as unsafe by the automobile industry for years. No American car had utilized this door design since the mid-1960's, because of the danger of inadvertent door openings.

Based on his own experiments, Gray concluded that at 30 to 35 miles per hour, the speed of the Fortman Jeep at the time of the accident, it would have taken no more than a second from the moment the door became unlatched to when it opened 180 degrees, slapping against the back of the jeep. He said that within a half second a child holding onto the handle when the door opened could be yanked from the car.

In addition to the danger of inadvertent door openings, Gray identified a second danger created by the use of exposed, nonrecessed interior door handles. The use of this kind of handle creates the possibility of a passenger or driver grabbing the handle in an emergency and unlatching the door. Gray concluded that the jeep door was defective for both these reasons.

Gray also testified to the role played by the mold-maker in the manufacturing process. Gray characterized the making of the mold as "the first step" of that process. A fiberglass product, like the door, could not have been manufactured without a fiberglass mold. The mold imparted the exact shape which all subsequent doors would take.

Gray's testimony suggested that Hemco would have been aware of the defective configuration of the door from the outset of its involvement with

---

[4] Austin Hardware reached a settlement with Nichole in the course of the trial and was dismissed. Hemco is the only appellant in this appeal.

the project. The Hemco mold was made from a prototype, a mockup giving the appearance of the final product. Gray testified that the prototype would have shown that the design of the jeep top incorporated front-latching doors when Hemco's president, Hill, inspected the prototype. Moreover, the mold itself would have revealed an indentation at the site of the door's lock showing the door to be front latching. Indeed, because of manufacturing considerations, the mold-maker would have to pay special attention to that area of the door. The mold-maker would realize, therefore, that doors cast from this mold would be front latching.

Hemco did not put on any expert testimony. Instead, its case consisted of reading into evidence portions of James Greene's deposition. Greene had no recollection of the role that Hemco had played in the production of the jeep top,[5] supporting Hemco's position that its role was insignificant.

At the conclusion of the trial, the jury returned a verdict in which it found Hemco 25 percent liable for Nichole's injuries and her mother, Debra, 75 percent liable. Damages were awarded to Nichole in the amount of $23,742,620 of which $17,742,620 was for economic losses and $6 million for noneconomic losses. Hemco moved for a new trial and judgment notwithstanding the verdict. These motions were denied.

I

█ Hemco maintains that its involvement with the manufacturing process that resulted in the production of the defectively designed door was insufficient to warrant imposition of strict liability.[6] It also challenges the substantiality of the evidence on the liability issue. An overview of the nature and purpose of strict liability in products cases, and an examination of the evidence, refutes Hemco's position.

█ "Strict liability differs from negligence in that it eliminates the necessity for the injured party to prove that the manufacturer of the product which caused injury was negligent. It focusses [sic] not on the conduct of the manufacturer but on the product itself, and holds the manufacturer liable if the product was defective." (*Brown* v. *Superior Court* (1988) 44 Cal.3d 1049, 1056 [245 Cal.Rptr. 412, 751 P.2d 470]; *Barker* v. *Lull Engineering Co.* (1978) 20 Cal.3d 413, 434 [143 Cal.Rptr. 225, 573 P.2d 443, 96 A.L.R.3d 1].)

---

[5] Hemco's president, Ron Hill, also testified though not on Hemco's behalf. He was called as an adverse party by Nichole. While he admitted making the mold from Greene's prototype, he denied knowing the design incorporated front-latched doors. Evidently, the jury disbelieved him.

[6] Hemco does not argue that the design of the doors was not defective.

■ The purpose of strict liability is to "insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." (*Greenman* v. *Yuban Power Products, Inc.* (1963) 59 Cal.2d 47, 63 [27 Cal.Rptr. 697, 377 P.2d 897]; *Becker* v. *IRM Corp.* (1985) 38 Cal.3d 454, 459 [213 Cal.Rptr. 213, 698 P.2d 116, 48 A.L.R.4th 601].) To effectuate this "paramount policy" of protecting "otherwise defenseless victims of manufacturing defects and the spreading throughout society of the cost of compensating them," courts "have given this rule of strict liability a broad application" (*Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 250, 251 [85 Cal.Rptr. 178, 466 P.2d 722]), particularly in identifying those entities to which liability should be extended.

■ Contrary to Hemco's narrow view of who is liable in strict liability for defective products, California follows "a stream of commerce approach to strict liability in tort and extend[s] liability to all those who are part of the 'overall producing and marketing enterprise that should bear the cost of injuries from defective products.' [Citation.]" (*Becker* v. *IRM Corp., supra,* 38 Cal.3d at p. 459, quoting *Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 262 [37 Cal.Rptr. 896, 391 P.2d 168].) *Becker* is illustrative of the broad application of strict liability for defective products. In *Becker,* the Supreme Court imposed strict liability upon landlords for latent defects existing in the premises at the time the premises were let. The defendant landlord argued that strict liability should not be imposed on the purchaser of an existing building because he is "not part of the manufacturing and marketing enterprise," and had no business relationship with the builder. (*Becker* v. *IRM Corp., supra,* 38 Cal.3d at p. 465.) The court, however, characterized landlords as "an integral part of the enterprise of producing and marketing rental housing" with more than just "a random or accidental role in the marketing enterprise." (*Becker* v. *IRM Corp., supra,* at p. 466.)

As *Becker* illustrates, entities in the stream of commerce for purposes of strict liability are not limited to those readily identifiable as designer, manufacturer, or vendor of the defective product. Instead, strict liability is applicable to such entities which are "a link in the chain of getting goods from the manufacturer to the ultimate user or consumer. [Citations.]" (*Silverhart* v. *Mount Zion Hospital* (1971) 20 Cal.App.3d 1022, 1026 [98 Cal.Rptr. 187, 54 A.L.R.3d 250]; *Gehl Brothers Manufacturing Co.* v. *Superior Court* (1986) 183 Cal.App.3d 178, 186 [228 Cal.Rptr. 19] [strict liability devolves upon "all parties who have mutually participated, in a dependent, interrelated way, in designing, assembling, and marketing the offending product."].) "It is the defendant's participatory connection, for his personal profit or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product

. . . which calls for imposition of strict liability. [Citation.]" (*Kasel* v. *Remington Arms Co.* (1972) 24 Cal.App.3d 711, 725 [101 Cal.Rptr. 314] [imposing strict liability upon franchisor for defective product manufactured and distributed by franchisee].)

If one is part of the overall production and marketing enterprise, he may not escape liability by arguing he had no control over the cause of the defect. To hold otherwise would shift the focus from the product itself to an individual defendant's conduct. "California has utilized the enterprise stream of commerce liability concept in the strict liability field without regard for the individual defendant's control over the cause of defect in the product, although such control, if it exists, would remain a significant factor." (*Kasel* v. *Remington Arms Co., supra,* 24 Cal.App.3d at p. 725; *Angelus Associates Corp.* v. *Neonex Leisure Products, Inc.* (1985) 167 Cal.App.3d 532, 541 ["[P]ublic policy demands they (those involved in the manufacturing and marketing chain of a defective product) respond in damages to the injured consumer although they may be 'factually innocent' of any wrongdoing (citation)."].)

■ Like the landlord in *Becker,* Hemco contends that it was not part of the manufacturing and marketing enterprise by which the defective door ultimately reached the Fortmans. Even granting the factual differences between *Becker* and this case, Hemco's argument is not persuasive. Although it presents its position as a question of law, the extent and significance of Hemco's involvement in the manufacturing process is also a question of fact. On the issue of Hemco's involvement, the record reveals the following:

Redford's idea of manufacturing a fiberglass jeep top required that he consult someone in the business of making fiberglass molds because a fiberglass product cannot be manufactured without such molds; Hemco was in the business of manufacturing fiberglass molds and producing products from those molds; Hemco agreed to make a mold for the jeep top, including the doors; the purpose of such mold was to permit the casting of the parts which would then be assembled into the jeep top; any parts cast from the mold, including the doors, would identically conform to the mold; Hemco's president, Hill, took an active part in the design of the prototype or pattern from which the mold was to be made; the rear-hinged, front-opening configuration of the door would have been obvious to Hill, a trained engineer, from his examination of the pattern; Hemco made the mold which incorporated the defective design of the doors; Hemco also cast two jeep tops from the mold in furtherance of its bid to produce the tops commercially; Hemco was paid $2,500 for making the mold; Hemco's mold was then used by Rigid Forms to cast the jeep tops; though some alterations were made by Rigid Forms to Hemco's mold, there was no alteration made

to the mold for the defective side door; the doors of the Fortman jeep were cast from the Hemco mold.

This evidence yields the indisputable conclusion that Hemco was part of the overall manufacturing enterprise, a "link in the chain" (*Silverhart* v. *Mount Zion Hospital, supra,* 20 Cal.App.3d at p. 1026), by which the defectively designed door reached the ultimate consumer. Hemco's role was not "random or accidental" (*Becker* v. *IRM Corp., supra,* 38 Cal.3d at p. 466), nor was its role incidental. Hemco was in the business of making fiberglass molds for the purpose of producing fiberglass products. It was precisely for that reason that Redford went to Hemco. Without Hemco's participation he could not have turned his product concept of a fiberglass jeep top into a product.[7] Under these circumstances, extending strict liability to Hemco is neither unwarranted nor unfair.

Hemco's account of why strict liability should not apply to it amounts to little more than an effort to demonstrate its blamelessness. In the process, Hemco misapprehends the law and essentially ignores unfavorable evidence. Briefly, we consider its various arguments.

Hemco disclaims any role in placing the jeep top into the stream of commerce because its product, the mold, "was never marketed or distributed by anybody." The argument is disingenuous. As we have seen, the evidence shows that the mold was an indispensable part in the manufacturing process which ultimately produced the jeep top. This is sufficient participation in that process to extend strict liability to Hemco.

[7] Hemco's participation in the overall manufacturing enterprise also distinguishes it from the defendants in *Zanzig* v. *H.P.M. Corp.* (1985) 134 Ill.App.3d 617 [480 N.E.2d 1204], upon which it places principal reliance. In *Zanzig,* the plaintiff was injured by a defective die casting machine he was operating and sued, among others, the *owner* of the die. The owner had neither designed nor manufactured the die; its only participation had been to supply the company that did design and manufacture the die with a model of the part which the die would be used to cast. The appellate court upheld summary judgment for the owner on two grounds, neither of which is applicable to Hemco.

First, the court agreed that designing the end product to be cast by the die was not tantamount to designing the die itself because nothing in the record suggested that drawings of the end product included design specifications relevant to the design of the die. (*Zanzig* v. *H.P.M. Corp., supra,* 480 N.E.2d at p. 1208.) Here, by contrast, the Hemco mold produced the defective doors.

Second, the court exempted the owner of the die from strict liability because it was not in the business of selling or leasing dies. (*Zanzig* v. *H.P.M. Corp., supra,* 480 N.E.2d at p. 1209.) Hemco, on the other hand, is in the business of making fiberglass molds and products cast from such molds.

We have also read and considered the numerous California decisions that Hemco cites in its brief. They do no more than establish the principles which we have set forth at the outset of our discussion of strict liability in products cases without persuasively advancing Hemco's claim that it should be exempted from such liability.

Hemco seeks to avoid liability by characterizing the mold as "a one-of-a-kind device." The same contention was considered and rejected by the court in *Rawlings* v. *D. M. Oliver, Inc.* (1979) 97 Cal.App.3d 890 [159 Cal.Rptr. 119]. In *Rawlings,* the successor in interest to a manufacturer of nine kelp dryers which had been made for the plaintiff's employer according to the latter's specification argued that strict liability should not apply to products that are not mass-produced and sold to the public. The court rejected the argument. "Defendant's predecessor . . . appears to have been engaged in manufacturing and selling products as part of its full time commercial activity. The uniqueness of Kelco's order may not alter its responsibilities. [Citation.]" (*Id.,* at pp. 897-898; accord *DeLeon* v. *Commercial Manufacturing & Supply Co.* (1983) 148 Cal.App.3d 336, 347 [195 Cal.Rptr. 867].)

Equally unpersuasive is Hemco's claim that it did nothing more than follow the designer's prototype in making the mold. This claim is no defense. (*DeLeon* v. *Commercial Manufacturing & Supply Co., supra,* 148 Cal.App.3d at p. 346 [". . . Commercial's argument that the bin was made to fit Cal Can's production line and follow the pattern of the prototype bin is not a defense. (Citation.)"]; *Rawlings* v. *D. M. Oliver, Inc., supra,* 97 Cal.App.3d at p. 897.)

Hemco asserts that it had no power to control the production and marketing enterprise. The issue, however, is not control of the enterprise, but participation in it. (*Becker* v. *IRM Corp., supra,* 38 Cal.3d at p. 459; *Kasel* v. *Remington Arms Co., supra,* 24 Cal.App.3d at p. 725.) Here, there is ample evidence of Hemco's participation. Related to this assertion is Hemco's argument that strict liability should not be imposed because it failed to control the conduct of other members of the enterprise. The same analysis applies: The issue is Hemco's participation in the enterprise, not whether it exercised control over the defect or its source. (*Gehl Brothers Manufacturing Co.* v. *Superior Court, supra,* 183 Cal.App.3d at p. 186 [strict liability "falls in some proportion, to be determined by the trier of fact, on all parties who have mutually participated, in a dependent, interrelated way, in designing, assembling, and marketing the offending product."].)

In addition to the legal arguments, Hemco attempts to minimize the evidence that its president, Ronald Hill, may have participated in the design of the prototype from which the mold was made. Hemco's discussion concludes: "There is no substantial evidence that Hemco did a single thing beyond preparing the mold to match the prototype, and that isn't enough." Preliminarily, it was established by John Redford's testimony that Hill had some part in designing the prototype for the purpose of making a mold. There is nothing so inherently implausible about that testimony to justify disregarding it under the substantial evidence rule. More importantly, the

record as a whole establishes that Hemco's participation in the overall production enterprise as the *mold-maker* is sufficient to warrant imposition of strict liability.

Finally, Hemco argues that policy considerations militate against imposition of strict liability. The premise of this argument is untenable. Extending liability to Hemco breaks no new ground. Imposition of liability in this case is appropriate, as a matter of law, and supported by substantial evidence.

## II

Hemco complains of instructional error with respect to three instructions, BAJI No. 9.00.5, which defines a defective product, BAJI No. 9.00.7, which discusses a manufacturer's duty to warn, and BAJI No. 2.60, which sets forth the burdens of proof of the respective parties.

It is an elementary principle of appellate law that "[a] party may not complain of the giving of instructions which he has requested. [Citation.]" (*Gherman* v. *Colburn* (1977) 72 Cal.App.3d 544, 567 [140 Cal.Rptr. 330]; *Morris* v. *Frudenfeld* (1982) 135 Cal.App.3d 23, 34 [185 Cal.Rptr. 76].) An examination of the record in this case reveals that Hemco, as well as Nichole, sought the instructions about which it now complains, BAJI No. 9.00.5 and BAJI No. 2.60. Hemco attempts to avoid the consequences of its action by maintaining that its counsel sought only "the skeleton BAJI 9.00.5." This assertion is not only unsupported by the record but appears to be contradicted by it. In the only discussion regarding BAJI No. 9.00.5, it was Hemco's counsel who referred to the need to modify BAJI No. 9.00.5 in light of the court's denial of Hemco's "motion for summary judgment."[8]

As to BAJI No. 2.60, Hemco's claim that Nichole's counsel "completed, and induced the court to use" the instruction as given is, again, unsupported by the record. The record reflects only that both sides requested the instruction. We look no further. In any event, there was no error either in BAJI No. 9.00.5 and BAJI No. 2.60.

Nor did the court err in giving BAJI No. 9.00.7. A failure to warn can constitute a product defect. (*Lee* v. *Electric Motor Division* (1985) 169 Cal.App.3d 375, 387 [215 Cal.Rptr. 195].) Hemco's argument that the duty to warn was inapplicable to it because it was not the manufacturer relies upon the same narrow interpretation of manufacturer that we rejected in part I of this opinion. Finally, even if, arguendo, BAJI No. 9.00.7 was given

---

[8] Hemco's counsel was apparently referring to his earlier, unsuccessful motion for nonsuit.

in error, Hemco's perfunctory claim of prejudice ignores well-known yardsticks by which such claims must be measured. (See *LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 876 [148 Cal.Rptr. 355, 582 P.2d 946].)

## III

### A.

Hemco makes a number of arguments regarding the propriety of the damages that were awarded to Nichole. Before reaching those arguments it is necessary to set forth the evidence relevant to the damages issue.[9]

The record reveals that the injuries that Nichole sustained from the accident are permanent and catastrophic.

Dr. William Kneeland, a board certified pediatric neurologist, testified to her injuries and future medical expenses. Immediately after the accident, she was rushed from the scene to a nearby hospital where she remained in a coma for four months. Dr. Kneeland began to treat Nichole five weeks later. Dr. Kneeland was brought in because of Nichole's continuing coma and because she was experiencing convulsions. At the time he first saw her she was being treated by a number of doctors for her various injuries: an orthopedic doctor for broken bones, an oral surgeon for broken jaw and facial bones, a urologist for kidney damage, and a pulmonary specialist for lung damage. She required mechanical ventilation in order to breathe and had undergone a tracheotomy.

Dr. Kneeland's examination of Nichole revealed significant brain injury, specifically to the cerebral hemispheres of her brain and to her spinal cord. X-rays also showed atrophy, a shrinkage of the brain, which is an irreparable condition. Nichole underwent a craniotomy to relieve pressure from fluids that had collected in her brain.

At the time of her release, Nichole was still comatose. When she eventually regained consciousness, she was, and is, a paraplegic. She has no bowel or bladder function. She suffers from scoliosis, and must wear a body brace. To prevent seizures she takes phenobarbital, and macrodantin to prevent urinary tract infections. At some point she may require a colostomy.

---

[9] Hemco failed to set forth an account of the evidence to support its claim of excessive damages. Such failure can result in the argument being deemed waived. (*Leming* v. *Oilfields Trucking Co.* (1955) 44 Cal.2d 343, 356 [282 P.2d 23, 51 A.L.R.2d 107].) Nonetheless, we will consider Hemco's argument in the interests of justice.

As a result of the severe damage to her brain, Nichole will function at a five-year-old's intellectual level for the rest of her life. For a while she suffered cortical blindness, a condition in which the brain is unable to recognize an object that the eyes see. Even now she has perceptual problems and is sometimes unable to identify objects correctly.

Nonetheless, given appropriate care, Nichole will have a normal life expectancy which, at the time of trial, was estimated to be 70.9 years. She will never be self-sufficient, however, and will incur lifetime expenses for nursing and medical care and for therapy. Dr. Kneeland estimated that, in 1985 dollars, this care would cost $180,895 per year.

The largest single component of this expense is 16-hour-a-day nursing care estimated by Dr. Kneeland to cost $125,000 per year. Additionally, Dr. Kneeland testified that Nichole would require physician services for the rest of her life from a range of doctors, including a neurologist, a pediatrician, an orthopedic surgeon and an ophthalmologist. Extensive and varied laboratory services will also be required. Further expenses will also be incurred for educational and therapeutic services, including physical, occupational and speech therapy. Dr. Kneeland testified that Nichole would require a specially-equipped van, wheelchairs and other medical appliances over the course of her life. Finally, she will also require medicines.

Peter Formuzis, an economist, testified to the present cash value of Nichole's future expenses based, in part, upon Dr. Kneeland's figures. Using an actuarial table showing Nichole's life expectancy to be 70.9 years he calculated the present cash value of her future medical expenses to be $16 million. He also calculated her lifetime lost wages to be between $884,078 and $1,132,599.

Hemco did not put on evidence regarding damages.

The jury's subsequent award for economic losses was $17,742,620. Noneconomic damages were assessed at $6 million.

### B.

Hemco argues that the trial judge failed to make an independent assessment of the evidence relating to damages before denying Hemco's new trial motion. This contention is utterly without substance.

Code of Civil Procedure section 657 provides in part: "A new trial shall not be granted . . . upon the ground of excessive or inadequate damages, unless after weighing the evidence the court is convinced from the entire

record, including reasonable inferences therefrom, that the court or jury should have reached a different verdict or decision. ■ " Accordingly, in deciding whether to grant a new trial "the trial court must independently weigh the evidence and assess whether it sufficiently supports the jury's verdict. [Citations.]" (*People* v. *Capps* (1984) 159 Cal.App.3d 546, 552 [205 Cal.Rptr. 898], fn. omitted.) As a corollary to this rule, the trial court's ruling "is entitled to great weight" on appeal. (*Hilliard* v. *A. H. Robins Co.* (1983) 148 Cal.App.3d 374, 414, fn. 28 [196 Cal.Rptr. 117].)

■ Hemco relies on *Lippold* v. *Hart* (1969) 274 Cal.App.2d 24 [78 Cal.Rptr. 833], a rare reversal of a trial court's denial of a new trial. The judge in *Lippold* denied the motion for new trial in a personal injury action even though he believed the verdict was unfair and questioned the defendant's credibility as a witness. His reason for denying the motion was his belief that he was bound by the jury's unanimous verdict. On appeal, his ruling was reversed. The appellate court stated that the trial court is not bound by the jury's verdict but must "reweigh the evidence, the inferences therefrom, and the credibility of the witnesses in determining whether the jury 'clearly should have reached a different verdict' [citations]." (*Id.,* at pp. 25-26.)

Hemco would liken the actions of the judge in *Lippold* to that of the judge in the case before us, but there is no comparison.

Here, the trial judge conducted the trial in an informed, intelligent and scrupulously unbiased manner. On the specific issue of his handling of the new trial motion, it is quite clear that he was well aware of his duty to independently assess the evidence. Indeed, in reference to the liability issue, the judge expressly stated that he had "reviewed the evidence" and made his "own independent assessment" of whether it supported imposition of liability. It is simply not plausible that the judge could have discharged his duty properly with reference to the liability issue but not damages. The fact that he did not make explicit reference to the independent assessment standard in passing upon damages is not determinative. On appeal, where the record is silent we presume that an official duty has been correctly performed. (*People* v. *Mack* (1986) 178 Cal.App.3d 1026, 1032 [224 Cal.Rptr. 208]; Evid. Code, § 664.)

Equally unconvincing is Hemco's citation to a remark by the trial judge that he was "limited by the evidence at trial" in ruling on the new trial motion. This observation is absolutely correct. A trial judge *is* limited to a review of the evidence at trial and, as this judge recognized, cannot be guided by personal bias or belief. This remark in no way shows that he failed to independently assess the evidence. Rather, the remark reveals that

he had performed his function fairly and impartially and determined there was no rational basis in the evidence to warrant a new trial on damages. We accord this determination great weight as we approach Hemco's remaining arguments.

## C.

Hemco maintains that the award of damages was excessive. It is well settled that damages are excessive only where the recovery is so grossly disproportionate to the injury that the award may be presumed to have been the result of passion or prejudice. Then the reviewing court must act. (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 64 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878]; *Fagerquist* v. *Western Sun Aviation, Inc.* (1987) 191 Cal.App.3d 709, 727 [236 Cal.Rptr. 633].) The reviewing court does not act de novo, however. As we have observed, the trial court's determination of whether damages were excessive "is entitled to great weight" because it is bound by the "more demanding test of weighing conflicting evidence than our standard of review under the substantial evidence rule . . . ." (*Hilliard* v. *A. H. Robins Co., supra,* 148 Cal.App.3d at p. 414, fn. 28.) All presumptions favor the trial court's determination (*Fagerquist* v. *Western Sun Aviation, Inc., supra,* 191 Cal.App.3d at p. 727), and we review the record in the light most favorable to the judgment (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 927 [148 Cal.Rptr. 389, 582 P.2d 980]).

In light of these rules we reject Hemco's attack on the substantiality of the evidence to support that portion of the jury's award of $17,742,620 attributable to Nichole's economic losses.[10] Hemco attacks the testimony of economist Formuzis, claiming that his reliance upon Dr. Kneeland's estimate of Nichole's medical expenses was improper because Dr. Kneeland had no sufficient basis for estimating those costs. Hemco's argument is more rhetorical than real and amounts to a belated attack on the credibility of Nichole's witnesses. As we previously observed, however, it is not our function to weigh credibility. (*Hilliard* v. *A. H. Robins Co., supra,* 148 Cal.App.3d at p. 414, fn. 23.)

Nor is Hemco's reliance on *Pacific Gas & Electric Co.* v. *Zuckerman* (1987) 189 Cal.App.3d 1113 [234 Cal.Rptr. 630] persuasive insofar as it purports to support Hemco's argument that Formuzis's reliance on Dr. Kneeland's estimations was improper. The *Pacific Gas* decision involved expert testimony on the novel issue of the value of storage rights for

---

[10] Actually, Hemco's challenge goes only to future medical expenses, leaving unchallenged that evidence which goes to lost future wages.

underground reservoirs of gas. In that decision the record revealed that the plaintiff's expert disregarded pertinent information and fabricated information without a factual basis to arrive at a vastly overinflated valuation of those storage rights. (*Id.*, at pp. 1128-1134.)

Nothing comparable occurred in the case before us. There was nothing novel in the medical or rehabilitative services which Dr. Kneeland testified (orally and by written statement) Nichole would require. Nor did Hemco challenge the veracity of Dr. Kneeland's cost estimation or the manner by which it was derived. Hemco put on no evidence of its own on this issue. Only now, on appeal, does Hemco find reason to quarrel with those assumptions. It does so in the wrong forum.

Addressing a similar contention, the court in *Niles* v. *City of San Rafael* (1974) 42 Cal.App.3d 230, 243 [116 Cal.Rptr. 733], said: "The expert testimony was substantial evidence supporting the portion of the award relating to the future cost of attendant care. The substantial evidence test is applied in view of the entire record; other than a vigorous cross-examination of plaintiffs' expert, appellants presented no evidence on the cost of attendant care. The elaborate economic arguments presented in the briefs of appellants . . . might better have been presented to the jury in opposition to respondents' expert testimony." In our case, too, the testimony which we set forth in part III A is substantial evidence supporting the award for Nichole's future medical expenses.

### D.

■ Hemco next maintains that damages are excessive because they are disproportionate to the aggregate sum of good faith pretrial settlements. The assertion is specious.

The issue of disproportionality with respect to damages awarded at trial refers to whether the award is disproportionate "to any reasonable limit of compensation as shown by the evidence . . . ." (*Roedder* v. *Lindsley* (1946) 28 Cal.2d 820, 823 [172 P.2d 353]; *Bertero* v. *National General Corp., supra,* 13 Cal.3d at p. 64.) By contrast, disproportionality with respect to good faith settlements under Code of Civil Procedure section 877.6 involves "whether the amount of the settlement is within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries." (*Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488, 499 [213 Cal.Rptr. 256, 698 P.2d 159].)

In light of this distinction, Hemco's suggestion that the aggregate sum of good faith pretrial settlements sets the range by which posttrial damage

awards are to be measured for excessiveness is a case of comparing apples to oranges. No authority supports this proposition nor do considerations of policy and logic, and for good reason; the two things are not comparable.

In the first place, proportionality for good faith purposes can only be determined on "information available at the time of settlement." (*Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates, supra,* 38 Cal.3d at p. 499.) A trial, by its very nature, yields a fuller record of the plaintiff's damages. This is precisely why the question of excessiveness should be made in light of the evidence at trial and not by comparisons with a settlement made months or even years earlier. Second, the comparison is unwarranted because settlements are discounted to give an incentive for defendants to settle. (*Id.,* at p. 499 ["[A] settlor should pay less in settlement than he would if he were found liable after a trial."].) Accordingly, settlements may not only be based on a less than accurate picture of the damages but the settlement amount is further discounted to promote settlements. These considerations make it particularly inappropriate to use settlement awards as a benchmark to determine whether damages awarded by a jury are excessive.

E.

 Finally, Hemco spends considerable time arguing that the award is excessive because it is large, or, as Hemco puts it, "precedent shattering." Both the Supreme Court and this court long ago rejected this argument.

"The vast variety of and disparity between awards in other cases demonstrates that injuries can seldom be measured on the same scale. . . . For a reviewing court to upset a jury's factual determination [of damages] on the basis of what other juries awarded to other plaintiffs for other injuries in other cases based upon different evidence would constitute a serious invasion into the realm of factfinding. [Citations.]" (*Bertero* v. *National General Corp., supra,* 13 Cal.3d at p. 65, fn. 12; *Rodriguez* v. *McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626, 654-655 [151 Cal.Rptr. 399].)

The question of excessiveness must be answered in light of the evidence of what is required to compensate this victim for her damages. Our review of the record persuades us that these damages are not disproportionate to the amount of damages shown by the evidence.

IV

 As the prevailing party, Nichole was awarded prejudgment interest pursuant to Civil Code section 3291. That section provides: "In any action brought to recover damages for personal injury sustained by any

person resulting from or occasioned by the tort of any other person, corporation, association, or partnership, whether by negligence or by willful intent of the other person, corporation, association, or partnership, and whether the injury was fatal or otherwise, it is lawful for the plaintiff in the complaint to claim interest on the damages alleged as provided in this section. [¶] If the plaintiff makes an offer pursuant to section 998 of the Code of Civil Procedure which the defendant does not accept prior to trial or within 30 days, whichever occurs first, and the plaintiff obtains a more favorable judgment, the judgment shall bear interest at the legal rate of 10 percent per annum calculated from the date of the plaintiff's first offer pursuant to Section 998 of the Code of Civil Procedure which is exceeded by the judgment, and interest shall accrue until the satisfaction of judgment."

In December 1985 an offer pursuant to Code of Civil Procedure section 998 was made to Hemco on behalf of Nichole and her mother, Debra Fortman, who, at the time, was alleging a cause of action against Hemco for negligent infliction of emotional harm, for $1 million. Hemco declined to respond to the offer. After trial, the court awarded Nichole pretrial interest based on the December 1985 offer.

Hemco attacks the award on three grounds. First, citing Civil Code section 3291's reference to a tort "by negligence or by willful intent," Hemco argues that prejudgment interest is not authorized in a strict liability action. Hemco cites neither case authority nor legislative history in support of this argument but relies instead on general rules of statutory interpretation.

The first rule of statutory construction is, of course, that a statute should be construed to effectuate the intention of the Legislature in enacting it. (*Morin* v. *ABA Recovery Service, Inc.* (1987) 195 Cal.App.3d 200, 205 [240 Cal.Rptr. 509].) The purpose of Civil Code section 3291 is to foster settlements in cases involving personal injury. (*Morin* v. *ABA Recovery Service, Inc., supra,* at p. 206.) Indisputably, this action involves personal injury. It is not a plausible interpretation of legislative intent that the Legislature meant by section 3291 to encourage settlements in personal injury actions based in negligence or intentional tort but not those arising from strict liability. Moreover, we have examined the legislative history of section 3291 and find nothing in it to evince a legislative intention to exclude strict liability actions from the purview of that section.

Next, citing *Randles* v. *Lowry* (1970) 4 Cal.App.3d 68 [84 Cal.Rptr. 321], Hemco argues that the December 1985 offer was invalid because it was made by both Nichole and her mother. *Randles* was a personal injury action

in which a defendant made a settlement offer of $2,300 to three plaintiffs under the predecessor statute to Code of Civil Procedure section 998 without designating the amount offered to each individual plaintiff. Two of the three plaintiffs prevailed at trial but were awarded less than the statutory offer. On that ground, the trial court denied the plaintiffs' motion for costs.

The Court of Appeal reversed, characterizing the offer by defendant as a "nullity." The court explained: "The offer was made jointly to all plaintiffs, without designating how it should be divided between them. It is therefore impossible to say that any one plaintiff received a less favorable result than he would have under the offer of compromise." (*Randles* v. *Lowry, supra,* 4 Cal.App.3d at p. 74.)

*Randles* was recently followed in *Hurlbut* v. *Sonora Community Hospital* (1989) 207 Cal.App.3d 388 [254 Cal.Rptr. 840], in which three plaintiffs made a joint offer to compromise to a single defendant without designating how much each plaintiff would receive. At trial, each of the plaintiffs received less than their offer though the aggregate was greater. The Court of Appeal applied *Randles* and reversed the order granting plaintiffs' motion for expert witness costs, stating: "To consider plaintiffs' joint settlement offer as valid would deprive defendant of the opportunity to evaluate the likelihood of each party receiving a more favorable verdict at trial. *Such an offer makes it impossible to make such a determination after verdict.*" (*Id.,* at p. 410, italics added.)

In our case, Hemco would have us apply the rule of *Randles,* that joint offers are a nullity, without examining the reason for the rule. The reason, as both *Randles* and *Hurlbut* illustrate, is that in those cases it could not be determined after trial whether the individual plaintiffs received more than they would have received had the offer to compromise been accepted. In our case, however, it is absolutely clear that Nichole received a greater amount in damages after trial than she would have received had Hemco accepted the joint offer even if the entire amount of the offer, $1 million, is attributed to her. Nichole's mother dismissed her action, leaving Nichole as the sole plaintiff for purposes of damages. Moreover, Nichole's $23 million-plus award leaves no doubt in anyone's mind that her recovery far exceeded the statutory offer.

Under these facts, therefore, we decline to mechanically apply *Randles*.

▆▆▆ Finally, Hemco argues that Nichole's $1 million offer was not made in good faith. (*Elrod* v. *Oregon Cummins Diesel, Inc.* (1987) 195 Cal.App.3d 692 [241 Cal.Rptr. 108].) Having failed to make this argument below, Hemco may not now make it for the first time, particularly since the

issue of good faith is a determination "left to the sound discretion of the trial court. [Citation.]" (*Id.,* at p. 700.)

If we were to consider the point, we would not accept Hemco's characterization of a million-dollar offer as a token. The reasonableness of such offers must be made in light of the circumstances existing at the time of the offer (195 Cal.App.3d at p. 698) and not by virtue of hindsight. The record reveals that Nichole settled with other defendants for sums comparable to her offer to Hemco, indicating that the offer was made in good faith.

V

Finally, Hemco contends that the court failed to properly offset damages against two settlements, one for $900,000 between Nichole and AMC/Jeep, and the other for $2 million between Nichole and Austin Hardware. The arguments are without substance.

First, Hemco failed to seek an offset of the $900,000 guaranty by AMC/Jeep, none of which was ever actually paid to Nichole. Since the issue of offsets "is a question of fact" (*Syverson* v. *Heitmann* (1985) 171 Cal.App.3d 106, 110 [214 Cal.Rptr. 581]), Hemco's failure to seek an offset in the trial court precludes it from doing so on appeal. Second, as to the Austin Hardware settlement, Hemco did seek an offset but, as no part of that settlement had been paid, the court declined to make the offset. Instead, it invited Hemco to make an ex parte application for postjudgment setoffs at such time as the settlement was actually paid. (Code Civ. Proc., § 877, subd. (a).) We believe the court acted within its discretion in making this order and decline to reverse.

The judgment is affirmed. Nichole to recover her costs on appeal.

McClosky, J., and George, J., concurred.

A petition for a rehearing was denied June 27, 1989.