[No. B108984. Second Dist., Div. Two. Sept. 15, 1999.]

ELISABETH SARET-COOK, Plaintiff, Cross-defendant and Appellant, v. GILBERT, KELLY, CROWLEY & JENNETT et al., Defendants, Cross-complainants and Respondents.

1214

**COUNSEL**

Bruce Adelstein for Plaintiff, Cross-defendant and Appellant.

Ballard, Rosenberg & Golper, Richard S. Rosenberg and John J. Manier for Defendant, Cross-complainant and Respondent Gilbert, Kelly, Crowley & Jennett.

Horvitz & Levy, Barry R. Levy, Sandra J. Smith, Mary F. Dant; Rushfeldt, Shelly & Drake, Linda C. Miller and Christine L. Hoeffner for Defendant, Cross-complainant and Respondent Clifford H. Woosley.

**OPINION**

**ZEBROWSKI, J.**—Appellant Elisabeth Saret-Cook (Saret-Cook) sued her employer, respondent law firm Gilbert, Kelly, Crowley & Jennett (respondent GKCJ), and an individual partner in that firm, respondent Clifford H. Woosley (the individual respondent), for wrongful termination, sex and pregnancy discrimination, sex harassment, and retaliation. The individual respondent cross-complained for intentional infliction of emotional distress; invasion of privacy, etc. Respondent GKCJ cross-complained for declaratory relief enforcing a settlement agreement Saret-Cook had signed before filing suit.

A large portion of Saret-Cook's claim was summarily adjudicated against her based upon the settlement agreement. Summary adjudication was also granted for respondent GKCJ, dismissing all of Saret-Cook's termination-based claims. Summary adjudication was further granted against her on her

pregnancy discrimination claim. A jury unanimously found against her on the remainder of her complaint. The jury also found in favor of the individual respondent on his cross-complaint, awarding him $450,000 in compensatory damages and $75,000 in punitive damages. The trial court later reduced the punitive damages award to $100.[1] The court also awarded $650,000 in attorney's fees to respondent GKCJ (out of about $930,000 requested) pursuant to Government Code section 12965 and Civil Code section 1717. In addition, the court awarded $275,000 in attorney's fees to the individual respondent (out of about $328,000 requested) pursuant to Government Code section 12965. The court also entered a permanent injunction in favor of the individual respondent and his family, barring Saret-Cook from contacting him or his family; from coming within 150 yards of his home, his office, his wife's office or the schools attended by his children; from telephoning him, his wife or his children; etc. Finally, the court found Saret-Cook in contempt for multiple violations of orders not to harass opposing counsel. She was sentenced to 15 days in jail, and subsequently served 7.

Saret-Cook now raises three issues on appeal: First, she contends that the trial court abused its discretion in awarding attorney's fees to respondent GKCJ and to the individual respondent. Second, she contends that the trial court erred when it eliminated much of her claim by granting summary adjudication enforcing the settlement agreement. (Saret-Cook contends that she properly rescinded the settlement agreement because she was allegedly under the influence of Demerol when she signed it.) Third, Saret-Cook contends that the jury's award of $450,000 in compensatory damages to the individual respondent was excessive.

We will affirm the award of attorney's fees. It is more than amply supported by a voluminous record of egregious, vexatious, extortionate, etc., conduct by Saret-Cook, even recognizing that her conduct may have been fueled by poor mental health. We will also affirm enforcement of the settlement agreement for several reasons. Even assuming that the agreement was voidable due to Saret-Cook's Demerol consumption at the time of contract formation, and even assuming that Saret-Cook properly raised her objections to contract formation in the trial court, the settlement agreement was properly enforced for two reasons. First, Saret-Cook later ratified the

---

[1]The trial court found that Saret-Cook's financial condition would not support a punitive award larger than $100, citing *Adams* v. *Murakami* (1991) 54 Cal.3d 105 [284 Cal.Rptr. 318, 813 P.2d 1348]. This indicates that our consideration of the other portions of the award against Saret-Cook might be somewhat academic, since the judgment may not be collectible. Nevertheless, here we simply make the proper legal rulings. Questions of enforcement of judgment, dischargeability in bankruptcy, etc., are questions for another time and place.

agreement at a time when she did not lack capacity. Second, Saret-Cook could not rescind because she accepted the benefits of the agreement after any incapacity had ceased, and respondent GKCJ and the individual respondent suffered substantial prejudice from Saret-Cook's delay in attempting to rescind. Moreover, Saret-Cook never tendered back to respondent GKCJ all the consideration she received before attempting to rescind the settlement agreement. Finally, we will affirm the damage award to the individual respondent. It is quite modest in view of the evidence of damage inflicted by Saret-Cook.

## I. FACTUAL SUMMARY.

This case concerns the nightmarish aftermath of a failed office romance between Saret-Cook and the individual respondent, a real-life tragedy similar to the movie FATAL ATTRACTION (Paramount Pictures 1987). The evidence shows a relentless campaign of harassment by Saret-Cook against the individual respondent, tenaciously pursued with brutal effect. Both personal suffering and professional disaster resulted. A brief summary of the evidence presented in this dreadful case:[2]

In September of 1992, Saret-Cook telephoned respondent GKCJ seeking employment as a paralegal. She was referred to the individual respondent, interviewed, and hired. In March or April of 1993, Saret-Cook asked the individual respondent if he would act as her "supervising attorney" in the State Bar's law office study program (the study program).[3] He agreed.

Although both were married, both were at the time experiencing difficulties in their respective marriages. The individual respondent feared that his marriage might soon end, while Saret-Cook was unhappy in her marriage. At this time, the individual respondent was 41 years old with 2 sons. His wife was apparently of approximately equal age. Saret-Cook was 30 years old with 1 son and an adopted daughter. Her husband was in his early 60's. Saret-Cook and the individual respondent soon began a sexual affair. Saret-Cook later stated that she had fallen in love with the individual respondent when she first met him, admitted that she deliberately planned to seduce

[2]Both the attorney's fee awards and the award of compensatory damages must be affirmed if supported by substantial evidence. (*Fortman* v. *Hemco, Inc.* (1989) 211 Cal.App 3d. 241, 259 [259 Cal.Rptr. 311].) The facts are consequently stated in a manner favorable to respondents while still within the reasonable scope of the evidence. The additional facts specifically pertinent to the summary adjudication ruling regarding the settlement agreement are covered in the discussion of that ruling.

[3]The program qualifies successful participants to take the bar exam without formally attending law school. (Bus. & Prof. Code, § 6060.)

him, and admitted that she in fact had seduced him. The affair between Saret-Cook and the individual respondent resulted almost immediately in Saret-Cook's pregnancy.

In June of 1993, the individual respondent reported the affair and the resulting pregnancy to respondent GKCJ's managing partner. Although he told the managing partner that he and Saret-Cook had earlier talked about marriage, he also explained that he had decided to break off the affair and to recommit to his existing marriage. The office manager then spoke with Saret-Cook. He suggested that in view of the circumstances and possible future complications, it would be better if a new "supervising attorney" were found to mentor Saret-Cook in the study program. In response, Saret-Cook "went absolutely bonkers." She insisted that the individual respondent continue to act as her supervising attorney in the study program, giving as an explanation for this insistence her claim that she would lose credit in the study program should she change supervising attorneys, and be delayed in taking the bar exam.

The study program requires at least four years of study. (Bus. & Prof. Code § 6060, subd. (e)(3)(ii).) However, Saret-Cook claimed that she had already gained applicable credit by attending Columbia University law school for one year and by working for the Attorney General's office and the police commission, and that she had arranged for the bar examiners to give her credit for this experience. Based on these representations, the individual respondent and the managing partner believed that Saret-Cook needed only several months' additional work in the study program to be qualified to take the bar exam. Saret-Cook herself claimed that she could have qualified to sit for the February 1994 bar exam, but for the distraction from studies caused by her pregnancy. She claimed that for this reason she decided to postpone taking the exam until July 1994. These representations were untrue. She had not attended Columbia, did not have the claimed credit toward eligibility to take the bar exam, was never close to being qualified to take the bar exam in July of 1994, etc. When she registered with the State Bar for the study program, she projected a completion date of April 1996. Although Saret-Cook claimed that the individual respondent knew of the 1996 completion date, the events as they later unfolded were geared to a purported July 1994 bar exam date. The managing partner stated that he agreed that the individual respondent could continue to mentor her in the study program because he understood that she was nearing the end of the program and approaching eligibility to sit for the bar exam.

The individual respondent was a partner in respondent GKCJ's insurance bad faith appellate section. Saret-Cook was employed as a paralegal in that

section, and sometimes performed work assignments directly for him. Several weeks after the affair and resulting pregnancy were reported to the managing partner, a delegation of three GKCJ female attorneys complained to the managing partner that Saret-Cook was disrupting the office by continually arguing with personnel on her floor, insisting on discussing the intimate sexual details of her affair with the individual respondent, and publicly theorizing how she might rekindle the affair. The attorneys complained that Saret-Cook's conduct was interfering with productivity. Perceiving a developing morale problem, the managing partner transferred Saret-Cook (over her objection) to the general litigation department on a different floor. Pursuant to her demand, however, the individual respondent continued to act as her mentor in the study program.

Even after her transfer, Saret-Cook continued disruptive behavior in the new office locale, and continued her efforts to rekindle the affair. In August she falsely told the individual respondent that she had divorced her husband, and did induce him briefly to resume their affair. In October, however, the individual respondent irrevocably ended it. He later told colleagues that he could not believe that at one time he thought he might have been in love with Saret-Cook. More disruptive behavior on Saret-Cook's part followed the final termination of the affair. In December, for example, Saret-Cook pleaded with a female GKCJ attorney to intercede on her behalf with the individual respondent. When that attorney declined to become involved, friction and shouting followed between her and Saret-Cook on numerous occasions over the ensuing months.

Other strange and dishonest behavior developed as well. Although Saret-Cook learned eight weeks into her pregnancy that she was bearing a single child, she consistently told the individual respondent and others that she was pregnant with twins, even naming them "C." and "Clark." Shortly before her delivery, Saret-Cook asked the individual respondent for a check to pay for Clark's circumcision, which the individual respondent provided. After giving birth to a single female child, C., by emergency cesarean section on February 1, 1994, Saret-Cook phoned the individual respondent from the hospital and told him that "Clark" had been stillborn.[4] This news was particularly wrenching to the individual respondent, because he himself was a surviving twin. Saret-Cook knew this when she lied about "Clark," since the individual respondent had told her about his dead twin before the affair began. Saret-Cook also told others that "Clark" had died. The individual respondent was grief-stricken over the news of "Clark's" loss, and told his

---

[4]The individual respondent was not present at the birth, possibly because it was by emergency cesarean section, although this is not completely clear from the briefing.

two sons that they had just lost a brother.[5] In April, while Saret-Cook and the individual respondent were visiting a doctor with C., Saret-Cook told the doctor that C.'s twin had died two or three days before C. was born. Later, out of the individual respondent's presence, she told the doctor that the twin had actually died about eight weeks into her pregnancy. She told a variety of stories about "Clark" to a variety of people; the record is now clear that there never was a "Clark."

The baby C. had multiple complications and medical problems, and needed significant ongoing medical attention.[6] Saret-Cook told the individual respondent that she wanted to concentrate on the living, and therefore wanted no public mourning for the loss of "Clark." Saret-Cook stated that she would make arrangements with the hospital for the disposition of "Clark's" remains. There was no funeral. In late February, Saret-Cook began telling the individual respondent that "Clark's" death was the individual respondent's fault, saying "how does it feel to have killed your own son?" and "Clark is dead because you refused to give me the emotional support that I deserved when I was pregnant." In June 1994, while the individual respondent was engaged in obtaining care for C., Saret-Cook changed her story about "Clark." She now told the individual respondent that "Clark" had not actually been stillborn, but instead had miscarried in October. She stated that "Clark's" remains had been buried at Forest Lawn. The individual respondent promptly went to Forest Lawn in an unsuccessful search for the burial site. Not until later did the individual respondent learn that Saret-Cook's statements about "Clark's" existence and death were part of an elaborate lie.

Two weeks after C.'s birth, Saret-Cook returned to respondent GKCJ from maternity leave. She told the managing partner that she intended to resign from the firm, that it was her own personal decision and that she had not been pressured to resign. She stated, however, that she first needed to complete her study program. Initially she stated that she would resign effective July 5, then delayed the date to July 25, then August 8, then August 28, then September 1, each time explaining that the delay was necessary to

---

[5]The individual respondent had much earlier disclosed to his family his affair with Saret-Cook.

[6]Throughout the course of the events summarized here, the individual respondent had to continue to interact with Saret-Cook to obtain medical care for C. The focus of this case, however, is the events at the workplace, Saret-Cook's course of disruption and harassment, and the resulting employment and tort law issues. C.'s medical treatment is therefore not recounted in great detail. However, the occasions on which the individual respondent had to interact with Saret-Cook in order to provide medical care to C. provided Saret-Cook with continued opportunities for harassment.

enable her to complete the study program.[7] In March 1994, Saret-Cook also told her psychologist that she was threatening a scandal at the firm, that she loved the individual respondent, and that she hoped he would leave his wife and marry her.

Saret-Cook also told the managing partner that she intended to sue the firm. Settlement negotiations consequently commenced. Saret-Cook was represented by her attorney, Paul Caruso. On March 22, after significant negotiations, Saret-Cook advised respondent GKCJ that "the right choices have been made" and that she was prepared to sign "an agreement prepared by your counsel." On March 23, Saret-Cook left a voice mail message for the individual respondent stating "I am very, very pleased that everything has been resolved . . . I love you. Thank you very much. . . ." On March 24, respondent GKCJ presented a draft agreement to Saret-Cook and her counsel. Saret-Cook and her counsel proposed changes, some of which were later incorporated. The parties met again on March 30. During that meeting, two settlement documents were executed. The first was a two-page letter on GKCJ stationery captioned "Separation Agreement" bearing initialed handwritten interlineations and signed by a GKCJ partner and by Saret-Cook. The second was a four-page document on GKCJ stationery entitled "Separation Agreement" signed by a GKCJ partner and by Saret-Cook, and also signed (as a witness) by Attorney Caruso.

The letter confirmed a mutual understanding that Saret-Cook was voluntarily resigning from respondent GKCJ effective September 1, 1994 (five months after the March 30 date of the letter). It stated that in consideration of her voluntary resignation and the mutual promises contained in the attached Separation Agreement, respondent GKCJ would continue Saret-Cook's salary for four months after her resignation date, would pay her two weeks of vacation pay plus a bonus, would provide continuing medical insurance through the term of her salary continuation, would pay any additional funds necessary for continued medical coverage "under the federal COBRA law" after lapse of the salary continuation period, etc. The Separation Agreement contained a complete release of all of Saret-Cook's claims against respondent GKCJ and the individual respondent, a covenant

---

[7]As noted, Saret-Cook was never close to completion of the study program because she had not attended Columbia law school, had not amassed credits for work at the Attorney General's office or police commission, had not made arrangements with the bar examiners for credit for her work experience, etc. Saret-Cook clearly knew at the time of the settlement agreement that she would not be eligible to take the bar exam within the time allowed by the settlement agreement. Her false claims, however, induced respondent GKCJ to continue to employ her for more than six additional months and induced the individual respondent to continue to mentor her for more than six additional months.

that Saret-Cook would not sue respondent GKCJ or the individual respondent based upon any event occurring prior to execution of the agreement, an agreement that Saret-Cook would not again seek employment with the firm and an agreement that the firm "has the right to refuse to employ [Saret-Cook] based on this Settlement Agreement." It provided that no liability was admitted, and that in any action to enforce the agreement, the prevailing party would recover reasonable attorney's fees and costs, etc.[8] Following execution of the documents, Saret-Cook's attorney submitted a bill directly to respondent GKCJ as had been agreed. Respondent GKCJ paid the bill.

Even after execution of the settlement documents, Saret-Cook's disruptive behavior continued, including continued public discussions of her relationship with the individual respondent and arguments. She also began to use her phone excessively for personal calls. From mid-February to July of 1994, Saret-Cook made 3,600 calls from her office phone alone, over half of which were confirmed to be personal calls. She also began bringing C. into the office, often leaving the baby unattended and crying. She also commenced other bizarre deceptions. On one occasion, Saret-Cook reported that she was being threatened by opposing counsel in a case she was working on, that she was being followed, that one of her tires had been slashed and that her son had been accosted. The partner in charge removed her from the case and spent considerable time investigating, but found her allegations inconsistent and contradictory. When he asked her to provide substantiation of her claims, she instead asked a paralegal to confirm a false story about being followed. The quality of her work also deteriorated, with missed deadlines and undone administrative tasks.

Her disruptive behavior also escalated as her obsession with the individual respondent apparently intensified. She told a paralegal that she wanted to get pregnant by the individual respondent a second time because she felt he would then be forced to marry her. She told a GKCJ partner that she had hired a private detective to investigate the individual respondent's wife. In July of 1994, she used the firm printer to print a letter stating that the individual respondent's wife had an affair and that the individual respondent was not the father of his son. The pages were left in the printer and were found by a secretary.

On another occasion, she followed the female attorney who had declined to intervene on her behalf into the women's room, screaming that she was a

---

[8]The negotiations leading to this agreement, and the agreement itself, concerned only the relevant employment law issues. The family law issues of child support, custody, etc., between Saret-Cook and the individual respondent as the parents of C. (issues which did not involve respondent GKCJ), were handled separately in a family law proceeding not involved in this appeal. The individual respondent began providing support to Saret-Cook in the fall of 1993, before the birth.

"loud-mouth bitch," while the office manager escorted visitors through the office nearby. Her harassment of the individual respondent also intensified. She phoned the individual respondent incessantly, in his office, at his home, and on his car phone, and additionally phoned his wife as well. When the individual respondent stopped answering the repeated calls shown by the firm's internal caller identification system to be from Saret-Cook's office, she would dial "9" for an outside line and call again. The individual respondent would then have to answer in case it was a client. In less than six months, Saret-Cook made 599 calls from her office to the individual respondent via an outside line alone.[9] When respondent GKCJ's personnel manager gave her a memo reiterating the firm's phone use policy, Saret-Cook threw it against the wall. Thereafter her phone calls increased. The incessant phone calls prevented the individual respondent from working productively.

A paralegal testified that Saret-Cook admitted "wreaking havoc" on the individual respondent. She repeatedly entered the individual respondent's office and refused to leave, forcing him to work with his door locked to keep her out. She would bang on his locked door, shouting that she needed to talk with him. She refused to leave after study program sessions, insisting instead of staying to talk about personal matters. The individual respondent began holding the study program sessions in empty offices so that he could leave and return to his own office when the study session had ended. On one occasion, she blocked the exit from the empty office, daring him to physically move her to escape. Saret-Cook also hounded the individual respondent by continually following him, on two occasions even following him into the men's room. She told her psychologist that she hoped to marry him.

In response to the situation, the managing partner at first gave Saret-Cook a written reminder that she was, among other things, ordered to stop discussing personal matters in the office, to comply with the firm's limitations on children in the office, to submit her daily time sheets as required, to avoid excessive personal use of the telephone. After this written reminder proved ineffective to moderate Saret-Cook's conduct, the managing partner gradually imposed escalating restrictions on her, eventually limiting her office access to business hours, removing the computer and phone from her office, and restricting her work assignments. Arrangements were made for Saret-Cook to receive messages about incoming calls from reception, and to make a controlled volume of outgoing calls as needed. The managing partner did not fire Saret-Cook, believing that respondent GKCJ should adhere to

[9]This number does not include the many calls made via an office line or made from a phone outside her office. The evidence suggests that the number of calls in these latter categories was even larger.

the agreement to allow Saret-Cook to finish her purported study program. The situation was so severe, however, that in June of 1994 the individual respondent began commuting three days per week to respondent GKCJ's Riverside office in order to avoid Saret-Cook's depredations. He had to continue to come into the Los Angeles office on Tuesdays and Thursdays, however, to mentor Saret-Cook in her study program.

In July of 1994, Saret-Cook took time off, stating that she was taking the bar exam. After her return, she stated that she had taken the three-day exam and was awaiting the results. She even told the managing partner that the exam had not been as difficult as she had expected it to be. At trial, however, she admitted that she never took the bar exam and was never qualified to take the bar exam. Saret-Cook took almost the entire month of August as sick leave. Actually, however, she spent most of that month working at a different law firm, while still collecting a salary from respondent GKCJ. She later contended that she had received harassing and intimidating faxes from respondent GKCJ while at that other law firm. Later, these faxes were demonstrated to be forgeries. The phone logs from the other firm show that Saret-Cook continued phoning the individual respondent during this time, on one occasion phoning him 36 times in one day. The individual respondent had by now reached the point at which he was afraid to answer his phone and was having difficulty functioning.

On September 1, Saret-Cook attended her last study session with the individual respondent, and refused to leave afterwards. When the individual respondent attempted to leave, Saret-Cook first feigned fainting, then yelled "I'm going to destroy you, and I'm going to destroy your family and everything that's near and dear to you!" Despite the fact that September 1 was her agreed separation date, Saret-Cook nevertheless came into the office on September 2. A number of heated exchanges between Saret-Cook and GKCJ attorneys occurred, with conflicting evidence as to their cause and content. The managing partner received an emergency call on his car phone from the office administrator while the managing partner was en route to the firm's Orange County office, reporting on Saret-Cook's continuing disruption. He spoke to Saret-Cook by telephone from the Orange County office, asking her to just "leave with dignity." She hung up.

After her resignation date, Saret-Cook obtained employment at another law firm on the strength of her false representation that she had taken the bar exam. During her time at that firm, she continued her incessant calls to the individual respondent. On October 31, she phoned him and stated that she must see him outside the office because she was about to do something that

would destroy them both. He refused to see her, but later that day was hospitalized, and remained hospitalized for four days. Saret-Cook continued to phone him at the hospital. She also repeatedly phoned the individual respondent's wife at home and at work, calling her a "slut" and asking scurrilous questions. At times, Saret-Cook would claim she was a reporter with the National Enquirer, or say she was calling about the Sally Jessie Raphael program. On the birthday of the individual respondent's youngest son, Saret-Cook phoned his wife pretending to be a reporter for the Los Angeles Times and asking about her husband's affair and illegitimate child. In November of 1994, the individual respondent changed the home phone number his family had used for eight years. Yet after only three weeks, phone calls from Saret-Cook began again. The individual respondent testified that he felt oppressed and that his family was frightened.

The individual respondent reported the incessant phone calls to the police, and a tracer was installed on the family phone. The calls continued. On January 26, 1995, for example, the family received six calls from Saret-Cook, each made one minute apart. In her many calls, she would ask the individual respondent's wife "how many illegitimate children do you have?" or would ask the 14-year-old son "who is your daddy?" or tell him to ask his mommy about her lover. The family changed its phone number four times in an attempt to stop the calls. By March of 1995, the calls that could be positively identified as from Saret-Cook had stopped, but untraceable crank "hang-up" calls persisted. Some of these calls were made from public pay phones near Saret-Cook's home and workplace.

Friction and tension between Saret-Cook and the individual respondent continued due to their necessary interactions relating to C.'s need for medical care. The individual respondent became increasingly distraught, and increasingly unable to focus on his work. By May of 1995, he was experiencing weight loss and muscle spasms. A psychiatrist diagnosed him as suffering from depression, and treated him until July of 1995, when the individual respondent (rather than the psychiatrist) discontinued the treatments. By the winter of 1995, however, neither his condition nor his productivity had improved. As a consequence, he was asked to step down from his partnership in respondent GKCJ. He testified that he felt that he had lost something he had worked for his entire life. His income was reduced by over half. As a consequence, he could no longer afford the family home, and had to sell it. He also began taking medication to control muscle twitching. In February of 1996, he resumed psychiatric care. He had lost over 30 pounds, could not sleep, was extremely anxious, and suffered from muscle spasms, restlessness and suicidal thoughts. He was diagnosed as having major depression, placed

on disability, and prescribed antidepressant and antianxiety medications. On a depression scale of one to ten, his psychiatrist placed him at an eight or nine. As of the time of trial in July of 1996, he remained on disability.

In his opening statement at trial, Saret-Cook's own attorney acknowledged that Saret-Cook had significant psychological problems, and conceded that these psychological problems would often "override her sense of honesty." Saret-Cook's first witness at trial was her psychiatrist. Her psychiatrist testified that Saret-Cook had "a classic severe personality disorder . . . with histrionic, borderline, and antisocial traits." He testified that her psychological problems of anxiety and nervousness, fear of desertion, lack of self-worth, etc., manifested themselves by her not telling the truth. He further opined that Saret-Cook might lie to the jury to avoid looking bad. The psychiatrist further opined that these personality traits had developed during Saret-Cook's adolescence, and that the individual respondent had not caused them. In closing argument, Saret-Cook's counsel conceded that she had been false in some of her testimony. The jury deliberated only a few hours before rendering a verdict against Saret-Cook.

## II. THE SUMMARY ADJUDICATION MOTION.

 Before trial, both respondent GKCJ and the individual respondent moved for summary adjudication of all of Saret-Cook's claims based on events which occurred before execution of the settlement agreement. (Cf. *Lilienthal & Fowler* v. *Superior Court* (1993) 12 Cal.App.4th 1848 [16 Cal.Rptr.2d 458] [summary adjudication may be granted on separate causes of action even if commingled in the complaint].) Saret-Cook now appeals from the granting of these motions solely by contending that she was entitled to, and did, rescind the settlement agreement. Saret-Cook claims that she was under the influence of Demerol at the time of execution of the agreement, that she therefore lacked the capacity to contract, and that the settlement agreement was therefore voidable.

The issue of Saret-Cook's contractual capacity at the time of execution of the settlement agreement is not determinative here, for even if Saret-Cook lacked contractual capacity at the time of execution of the settlement agreement, it was nevertheless properly enforced for at least two reasons. First, undisputed facts establish that Saret-Cook ratified the settlement agreement during a time as to which there is no evidence that she lacked contractual capacity. Ratification when the actor possesses the capacity to contract has the same effect as valid contract formation. Second, Saret-Cook delayed her

attempt to rescind until long after she had knowledge of the alleged ground for rescission, and the respondents suffered considerable prejudice from Saret-Cook's delay. Rescission is unavailable to her in these circumstances.

■ Civil Code section 1588 provides that "[a] contract which is voidable solely for want of due consent, may be ratified by a subsequent consent." Additionally, Civil Code section 1589 provides that "voluntary acceptance of the benefit of a transaction is equivalent to a consent of all the obligations arising from it, so far as the facts are known, or ought to be known, by the person accepting." In *Neet* v. *Holmes* (1944) 25 Cal.2d 447, 457-458 [154 P.2d 854], the Supreme Court stated: ". . . [A] party to a contract who wishes to rescind cannot play fast and loose. He cannot conduct himself so as to derive all possible benefit from the transaction and then claim the right to rescind. [¶] . . . The right to rescind may be waived. [Citations.] It is waived by recognition of the existence of the contract after the right to rescind was created. [Citation.] Waiver of a right to rescind will be presumed against a party who, having full knowledge of the circumstances which would warrant him in rescinding, nevertheless accepts and retains benefits accruing to him under the contract. [Citation.]" The *Neet* court gave this example: ". . . [A]n affirmance of the contract at a time subsequent to the discovery of the falsity of the representations inducing its execution [inducement of contract by false representations provides a basis for rescission analogous to lack of capacity to contract] forecloses the exercise of the right of rescission." (*Id.* at p. 458.)

■ The record is replete with evidence that Saret-Cook, a law student, knew of and even discussed her ingestion of Demerol as grounds for avoiding the settlement agreement shortly after the documents were executed. Nevertheless she continued to accept benefits under the agreement until her physical separation from the office pursuant to the terms of the agreement. She accepted salary plus other employment benefits such as medical insurance, accepted her continued participation in the study program, accepted the use of office equipment, etc., and later accepted vacation pay, a bonus, etc. Then, three weeks after her agreed separation date, she stated that she chose not to "recognize" the agreement, and now contends that she effectively rescinded the agreement. This contention cannot prevail in view of the voluminous record of her acceptance of the benefits of her agreement over the course of five months following execution of the documents, and the absence of any evidence that she lacked contractual capacity for this entire period.

On appeal, Saret-Cook contends that she could and did properly rescind on the theory that in accepting the continued benefits of employment at

respondent GKCJ, she was not accepting benefits pursuant to her settlement agreement. Her theory is that her continued employment was not a benefit of the settlement agreement, and that the settlement agreement covered only what was to happen *after* her separation from respondent GKCJ. This argument has no merit for several reasons, only two of which need be mentioned here. First, in her separate statement in response to the summary adjudication motions, Saret-Cook admitted as undisputed the stated fact that "[u]nder the terms of the Separation Agreement, plaintiff was to and did remain employed through September 1, 1994 in order to complete the [bar study] Program." Hence she conceded in the trial court the issue she now attempts to contest here. Second, and relatedly, Saret-Cook's instant argument on appeal (that she never accepted benefits under the settlement agreement) was not raised in the trial court.[10] Thus not only has this issue been waived for appellate purposes (*Royster* v. *Montanez* (1982) 134 Cal.App.3d 362 [184 Cal.Rptr. 560]), it was expressly conceded in the trial court. Saret-Cook thus attempts to apply a "moving target" strategy, changing from one position to another as appears necessary to preserve her case. Such tactics are not permissible.

Saret-Cook also relies on Civil Code section 1693, which sets forth the effect upon relief of delay in notice of rescission or in restoration of benefits. Section 1693 provides that relief "shall not be denied because of delay in giving notice of rescission unless such delay has been substantially prejudicial to the other party." Saret-Cook contends that she was entitled to rescind notwithstanding her delay in giving notice of rescission on the theory that her delay did not cause either respondent GKCJ or the individual respondent any substantial prejudice. A simple reading of the factual summary above refutes this contention. Had Saret-Cook given notice of rescission shortly after execution of the settlement documents, respondent GKCJ would have had the option of promptly discharging her, terminating the study program and excluding her from the office, rather than enduring the ensuing five months of suffering, turmoil, disruption and damage. As the facts so amply show, an additional five months of Saret-Cook in the office and in the study program was surely "substantially prejudicial" to respondent GKCJ and to the individual respondent.

Hence the trial court properly ruled that the settlement agreement was valid, and barred all of Saret-Cook's claims based on events which occurred before execution of the settlement documents.

---

[10]Her failure to raise this issue in the trial court is consistent with Saret-Cook's admission that it was undisputed that her continued employment until September 1 was pursuant to the terms of the settlement agreement.

III. The Attorney's Fee Awards.

a. *Fees for presettlement issues versus fees for postsettlement issues.*

██ Although the trial court did not allocate its fee award between presettlement issues and postsettlement issues, it facilitates analysis to think of these two periods separately. Hence below the fee award is discussed as if allocated, even though it was actually awarded in an unallocated lump.

Preliminary, Saret-Cook argues that substantial fees should not have been awarded against her because of her allegedly penurious condition. This argument was not made to the trial court, and hence was waived. (*Royster* v. *Montanez, supra*, 134 Cal.App.3d 362.)

b. *Fees relating to issues arising in the presettlement period.*

The settlement agreement contained an attorney's fee clause providing that in any action to enforce the provisions of the agreement, the prevailing party was entitled to fees. Since the settlement agreement was properly enforced, the fee award was correct on this basis alone insofar as it pertained to the presettlement period. The fee award for the presettlement period is therefore affirmed.

The trial court also awarded these same presettlement period fees pursuant to Government Code section 12965, subdivision (b). ██ This section provides that in a case alleging violation of the Fair Employment and Housing Act (FEHA), the court may, in its discretion, award fees to the prevailing party. Such an award is hence reviewed according to the abuse of discretion standard. (*Bond* v. *Pulsar Video Productions* (1996) 50 Cal.App.4th 918, 921 [57 Cal.Rptr.2d 917].) ██ The question insofar as Government Code section 12965, subdivision (b) is concerned is therefore whether the trial court abused its discretion in awarding fees against Saret-Cook for the presettlement period. Inasmuch as the award of these fees must be affirmed pursuant to the contractual clause in the parties' agreement in any event, this question is moot insofar as the presettlement period is concerned.

The trial court also awarded attorney's fees for the postsettlement period pursuant to Government Code section 12965, subdivision (b). Whether that was an abuse of discretion is considered next below.

c. *Fees relating to issues arising in the postsettlement period.*

On appeal, Saret-Cook also contends that the court erred in awarding fees for the postsettlement period pursuant to Government Code section 12965,

subdivision (b). To support this argument, she cites *Cummings* v. *Benco Building Services* (1992) 11 Cal.App.4th 1383, 1387 [15 Cal.Rptr.2d 53], for the proposition that fees can be awarded against a plaintiff in an FEHA case only if the plaintiff's case is " ' "unreasonable, frivolous, meritless or vexatious." ' " Saret-Cook's briefing then focuses on the trial court's finding that her case was without merit. She then engages in extended factual argument contending that although she lost her case, it was not completely "without merit." This line of argument builds to the conclusion that since her case was not *completely* without merit, no fees should have been awarded.

The argument fails for several reasons. First, the argument that fees under Government Code section 12965, subdivision (b), should have been denied on the theory that there was some merit in her case is an issue which was never raised in the trial court. Saret-Cook opposed the motion for fees on various grounds, but a claim that fees were not awardable because of the merit in her case was not one of them. Hence the issue has been waived for purposes of appeal. (*Royster* v. *Montanez, supra*, 134 Cal.App.3d 362.)

A second reason the argument fails is that, even according to Saret-Cook's briefing, there are four possible bases for a fee award pursuant to Government Code section 12965, subdivision (b). These are stated in the disjunctive: fees can be awarded if the plaintiff's action was " ' "unreasonable, frivolous, meritless or vexatious." ' " (*Cummings* v. *Benco Building Services, supra*, 11 Cal.App.4th at p. 1387.) After the trial, the trial court issued an order finding as follows:

". . . [Saret-Cook's] actions and tactics in filing and prosecuting this lawsuit were frivolous and totally and completely without merit. Further, Plaintiff's actions and tactics in filing and prosecuting this lawsuit were done with subjective bad faith. This wholly unmeritorious lawsuit should never have been filed or maintained. Indeed, the record demonstrates that Plaintiff's motive in filing and prosecuting this lawsuit was to harass Defendants, individually and collectively."

"At no time did this action ever have a factual basis. Plaintiff simply lied about what occurred to her. She was aware of her lies during the course of this lawsuit and persisted in weaving a more and more incredible story to explain lies with more lies. She prosecuted this lawsuit to the point of harassing Defendants and third party witnesses. Her bad faith is evidenced by, among other things, her actual knowledge of the falsity of her allegations and testimony."

These findings by the trial court amounted to much more than only a finding that her action lacked merit. Fairly read, it also constituted a finding

that Saret-Cook's action was "unreasonable," was "frivolous," and was "vexatious." These findings are overwhelmingly supported by evidence in the record. It was no abuse of discretion for the trial court to reach these conclusions.

Hence the fee award against Saret-Cook pursuant to Government Code section 12965, subdivision (b) is affirmed.

## IV. THE DAMAGES AWARDED TO THE INDIVIDUAL RESPONDENT.

■ Saret-Cook contends that the $450,000 damage award to the individual respondent was excessive, and must be reversed for that reason. A damage award is reversible as excessive only when it is so grossly disproportionate to the injury suffered that the award appears to be the product of passion or prejudice. (See, e.g., *Fortman v. Hemco, Inc., supra,* 211 Cal.App.3d 241, 259.) Saret-Cook contends that the award is out of proportion to the damages suffered by the individual respondent. She further claims that the award was the product of improper closing argument.

As the factual statement above sets forth, the individual respondent was forced to endure a devastating and relentless course of harassment. Unfortunately, but quite understandably, he suffered substantial psychological distress and depression, as well as physical effects such as loss of weight and muscle spasms. The record contains more than substantial evidence that both the physical and psychological distress was caused by Saret-Cook's harassment. The individual respondent also lost his partnership at respondent GKCJ. The evidence showed that his income had been upwards of $250,000 per year, but fell to less than half that after he lost his partnership. The loss of income in turn caused loss of the family home. There was more than substantial evidence to support that these losses were also caused by Saret-Cook's harassment.

Saret-Cook complains that the closing argument made by the individual respondent's counsel "blatantly encouraged the jury to award damages based on their dislike of [Saret]-Cook, rather than on [the individual respondent's] emotional distress damages." However, Saret-Cook does not cite to anywhere in the record where she objected to this argument in the trial court, or asked for an admonishment or a curative instruction. The point is therefore waived. Moreover, counsel for the individual respondent twice told the jury that the purpose of the damage award was not to punish Saret-Cook, but to compensate the individual respondent. The trial judge similarly advised the jury, and the jury was properly instructed. In addition, the individual respondent's counsel asked in closing argument for an award of only $350,000 to

$400,000, while the jury chose to award more—$450,000. There is no basis in this record to find that the award was the product of improper argument. Instead, it appears that the jury that heard this evidence might have awarded even more in damages if counsel had asked for more. The amount that was awarded was quite moderate in comparison to the damage inflicted. The individual respondent's objectively verifiable economic damages alone, leaving aside consideration of his physical and psychological damages, would support a jury award far larger than the one rendered by this jury. The damage award is therefore affirmed.

## V. DISPOSITION.

The judgment is affirmed. Respondents to recover costs on appeal.

Boren, P. J., and Mallano, J.,* concurred.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.