Filed 7/16/14  Bio-Tek Technology v. Queen's Dialysis Unit CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| BIO-TEK TECHNOLOGY, INC, | B245128 |
| Plaintiff, Cross-defendant and Appellant, | (Los Angeles Country Super. Ct. No. BC446507) |
| v. | |
| QUEEN'S DIALYSIS UNIT, INC.  et al. | |
| Defendants, Cross-complainants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles Country, Rita Miller, Judge.  Affirmed.

Law Offices of Joseph R. Zamora, Joseph R. Zamora, for Plaintiff, Cross-defendant and Appellant Bio-Tek Technology, Inc.

Cole Pedroza, Curtis A. Cole and Matthew S. Levinson, for Defendants, Cross-complainants and Respondents Queen's Dialysis Unit, Inc., Claudio Gallego and Aamir Z. Jamal.

_____

Bio-Tek Technology, Inc. (Bio-Tek) appeals from a summary judgment in favor of respondent Queen's Dialysis Unit, Inc. (QDU) and two of its shareholders, respondents Claudio Gallego and Aamir Jamal.[1]  We agree with respondents that appellant's claims are barred by a release that has not been rescinded, and affirm.

## FACTUAL AND PROCEDURAL SUMMARY

Bio-Tek provides administrative and managerial services related to biomedical treatment, including dialysis.  QDU is a professional corporation that operates a dialysis clinic.  Medical doctors Gallego and Jamal are two of the four shareholders, officers, and directors of QDU.

In 2005, Bio-Tek submitted a bid to the California Department of Corrections and Rehabilitation (CDCR) for a contract to provide dialysis services to prisoners at the rate of $195 per treatment.  QDU agreed to be Bio-Tek's subcontractor for the bid and to charge $150 per treatment.  The remaining $45 was to go to Bio-Tek for services in administration and management of the program.  The bid was rejected because at the time neither Bio-Tek nor QDU was a professional medical corporation and CDCR was concerned that, because they were not, a contract with either would violate the prohibition against the unlicensed or corporate practice of medicine.[2]  The CDCR contract was awarded to Colonial Medical Group, Inc. (Colonial).  Bio-Tek unsuccessfully protested the rejection of its bid, petitioned for a writ of mandate, and then appealed the adverse decision.  Meanwhile, QDU became a professional medical corporation.

---

[1] Jamal is incorrectly sued under the name Amir Z. Jamal.

[2] Administering the business affairs of a clinic is practice of medicine, and a physician is subject to discipline for aiding or abetting any unlicensed practice.  (See *Steinsmith v. Medical Board* (2000) 85 Cal.App.4th 458, 465–466 [physician working as independent contractor of clinic owned by administrators who were not licensed physicians was sanctioned for aiding unlicensed practice of medicine in violation of Bus. & Prof. Code, § 2264.])  Generally, a corporation may not practice medicine, but a

In February 2007, while Bio-Tek's appeal was pending, Colonial offered to Bio-Tek to subcontract the CDCR contract on the terms of Bio-Tek's earlier proposed bid. Bio-Tek again invited QDU to be its subcontractor. All parties agreed to the arrangement, but the receiver overseeing the California prison health system requested that QDU contract directly with Colonial and that Bio-Tek serve as QDU's subcontractor. At a March 12, 2007 meeting, the contractual positions of Bio-Tek and QDU were rearranged accordingly. After the meeting, QDU took the position that paying Bio-Tek would violate anti-kickback laws. It refused to use Bio-Tek as a subcontractor on the contract with Colonial. Bio-Tek threatened to sue both QDU and Colonial. QDU insisted that, before it could enter into a contract with Colonial, Colonial had to enter into a separate compensation agreement with Bio-Tek and Bio-Tek had to release all claims related to QDU's contract with Colonial.

On March 19, 2007, Colonial's management company, The Centennial Group (Centennial), entered into a memorandum of understanding (MOU) with Bio-Tek, which provided that Bio-Tek would assist Centennial "in the administration, management, recruiting, and other functions" related to the CDCR contract if QDU contracted with Colonial. Under the CDCR contract, Colonial was to receive $230 per treatment. Centennial agreed to pay Bio-Tek between 7 and 9 percent of that rate. The MOU recited that Bio-Tek would enter into a release with QDU in consideration for Centennial's promise to pay those fees so long as Colonial was involved in the CDCR contract. By its own terms, the MOU was void if QDU did not contract with Colonial.

On the same day, Bio-Tek's President, Tarik Omari, refused to sign the release without additional compensation. In a telephone conversation with Omari, respondent Gallego, QDU's president, agreed to pay Bio-Tek $10 per treatment for Bio-Tek's offer to provide services and disposable items for the dialysis project. After he was assured that the $10 deal would be added to the release, Omari signed it on behalf of himself and Bio-Tek (collectively "Releasing Parties"). The release provides: "To resolve the

professional medical corporation is an exception to that ban. (Bus. & Prof. Code, § 2400; Corp. Code, § 13400 et seq.)

3

litigation between them, Colonial and Bio-Tek decided that Colonial would subcontract with QDU directly to perform the onsite dialysis services called for in the Competitive Bid and that Colonial would negotiate a settlement of Releasing Parties' claims in the litigation directly with Releasing Parties." It provides further that QDU was willing to subcontract directly with Colonial only upon the execution of the release. "[I]n consideration of the mutual covenants, agreements, and understandings contained" in the release, Bio-Tek and Omari released all claims arising out of their relationship with QDU in connection with the CDCR bid and contract up to the time of the release. After learning that Omari had signed the release, QDU entered into an agreement with Colonial to provide dialysis treatment under the CDCR contract at a rate of $190 to $197.50 per treatment.

The following day, QDU's attorney left a telephone message for Bio-Tek's attorney, stating that the "last minute deal . . . should not have been made" and needed to be "unmade." QDU's attorney was not sure what would "happen next, maybe the whole deal will blow up; maybe it won't," but he asked Bio-Tek's attorney to call him. Neither Bio-Tek nor Omari followed up on this message.

Later, Bio-Tek entered into a separate agreement with Centennial to assist in the administration of Colonial's CDCR contract.[3] It was to be paid 8 to 10 percent of the gross monthly revenues, and payments were to be adjusted depending on the rate charged by QDU. The MOU was incorporated by reference into the Centennial agreement.

QDU's agreement with Colonial was terminated in December 2009. Centennial paid Bio-Tek through September 2010. That month Bio-Tek sued QDU and all four of its shareholders.[4] According to Omari, Bio-Tek did not sue earlier because between 2007 and 2009 respondent Jamal repeatedly assured him that QDU would "make it right" by

---

[3] The date recited in the agreement is March 28, 2007 even though Omari did not sign it until January 2008. In September 2007, Bio-Tek began receiving payments for consulting work done as early as June 2007.

[4] Two shareholders, S. Arif Rizvi and Mojaba Moghadam, were later dismissed.

4

working with Bio-Tek on future contracts. In 2010, QDU made it clear it would not work with Bio-Tek.

The operative second amended complaint was filed in 2011. A demurrer to it was sustained in part without leave to amend. The remaining claims are for breach of contract; interference with contract, or with existing or prospective economic relationships; fraud; aiding and abetting; and unfair business practices. Most of these claims are based on the allegation that QDU prevented Bio-Tek from receiving the originally agreed-upon rate of $45 per treatment. The fraud cause of action is based on allegations that QDU secretly approached Colonial with an intent to cut Bio-Tek out of the CDCR contract and keep the entire $195 fee for itself, that it manufactured a false excuse for not being able to work with Bio-Tek, and that Jamal and others prevented Bio-Tek from suing earlier by making false promises that QDU would work with Bio-Tek on other projects. The complaint also includes allegations that Gallegos orally promised that QDU would pay Bio-Tek $10 per treatment, but QDU reneged on that promise and refused to honor a 2010 invoice in the amount of $147,000 based on that rate. The complaint seeks damages and any other proper relief, but does not mention the release.

QDU and its shareholders raised the release as a defense in their answer and cross-complaint and then moved for summary judgment on the ground that Bio-Tek's claims were barred by the release.[5] In opposition, Bio-Tek argued the release was either voidable or void because Omari was fraudulently induced to sign it by the promise that QDU would pay Bio-Tek $10 per treatment, and that the court had equitable power to set it aside. Bio-Tek also argued the release was unenforceable since only Omari had signed it, and it did not extend to fraudulent activity that occurred after its execution.

The trial court granted the motion, finding the evidence of the last-minute $10 deal was improper parol evidence. The court also found Bio-Tek did not attempt to rescind

---

[5] Additional grounds listed in the motion were that the claims were barred by the statute of limitations and were based on illegal contracts; that there was no evidence of interference; and that Bio-Tek was estopped from asserting the alter ego doctrine against the shareholders.

the release until all contracts were completed, did not return the consideration it received under the contract it obtained in conjunction with the release, and in effect sought to "affirm the portions of the contract which benefit it but invalidate the portions which benefit defendants." The court specifically found that the "contract with Centennial would never have existed except as a way to pay for the release."

After judgment on the second amended complaint was entered, Bio-Tek appealed in case No. B239398. QDU and its shareholders appealed from the denial of their motion for attorney fees in case No. B240832. Both appeals were dismissed because of the pending cross-complaint. This appeal followed the dismissal of the cross-complaint.

## DISCUSSION

### I

Bio-Tek argues the judgment should be reversed because the trial court erred or abused its discretion in refusing to continue the hearing on the motion for summary judgment. We disagree.

Code of Civil Procedure section 437c, subdivision (h) requires the court to grant a continuance of a hearing on a motion for summary judgment if "facts essential to justify opposition may exist but cannot, for reasons stated, then be presented." In his declaration, Bio-Tek's attorney stated that several depositions still needed to be completed , but Bio-Tek does not explain what facts essential to the opposition were expected to come out those depositions. The attorney claimed that QDU's shareholders were asserting an advice-of-counsel defense but had refused to answer questions about this defense based on attorney-client privilege. While an advice-of-counsel defense may waive the privilege, it does not apply in this case because it was not asserted in the motion for summary judgment. (See *Southern Cal. Gas Co. v. Public Utilities Com.* (1990) 50 Cal.3d 31, 43 [no waiver where claiming party had not placed its attorney's advice or state of mind in issue]; *Transamerica Title Ins. Co. v. Superior Court* (1987) 188 Cal.App.3d 1047, 1053–1054 [no waiver where defense was not based on advice received and information sought bore only "indirect relevance to the lawsuit"].) Rather,

6

the defense advanced in the motion was that Bio-Tek's claims were based on illegal contracts.

Bio-Tek's counsel also sought a discretionary four-week continuance on the ground that the attorney with whom he had contracted to prepare the opposition to the motion for summary judgment had recently lost his mother. The ex-parte application for a continuance was filed on September 19, 2011. The court did not continue the October 11, 2011 hearing on the motion, but did continue the trial date. Bio-Tek's trial counsel filed the opposition on September 30, 2011, and its appellate counsel appeared at the hearing. "[A]n abuse of discretion results in reversible error only when the denial of a continuance results in the denial of a fair hearing, or otherwise prejudices a party. [Citation.]" (*Freeman v. Sullivant* (2011) 192 Cal.App.4th 523, 527.) Bio-Tek argues its trial counsel should not have been placed in the "untenable position" of having a grieving attorney prepare the opposition or finding a new attorney on short notice. Since the opposition to the motion was filed and argued, it is unclear how any inconvenience to counsel resulted in actual prejudice to Bio-Tek. Reversal is not required without a showing of prejudice.

## II

A defendant is entitled to summary judgment if there is no triable issue of material fact. (*Martinez v. Combs* (2010) 49 Cal.4th 35, 68.) We review the trial court's ruling on a motion for summary judgment de novo, viewing the evidence in the light most favorable to the opposing party. (*Shin v. Ahn* (2007) 42 Cal.4th 482, 499.) We consider all of the evidence offered by the parties in connection with the motion, except that which the court properly excluded. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.)

### A. Parol Evidence

After the judgment in this case, the California Supreme Court held that the fraud exception to the parol evidence rule applies to fraudulent representations that conflict with the terms of a written agreement. (*Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169 (*Riverisland*).) According to Bio-Tek, *Riverisland* mandates reversal because the trial court erred in excluding parol evidence to

7

show the release was induced by fraud. Respondents argue *Riverisland* should not be applied retroactively.

As a general rule, judicial decisions are given retroactive effect, except when they change settled law on which the parties may have relied. (*Claxton v. Waters* (2004) 34 Cal.4th 367, 378–379.) We disagree with respondents that the exception for justifiable reliance on a settled rule of law applies here. The *Riverisland* court described the rule adopted in *Bank of America etc. Assn. v. Pendergrass* (1935) 4 Cal.2d 258 (*Pendergrass*) as an "aberration." (*Riverisland*, *supra*, 55 Cal.4th at p. 1182.) By excluding evidence of fraud, *Pendergrass* provided "a shield for fraudulent conduct" and was inconsistent with Code of Civil Procedure section 1856, "which broadly permits evidence relevant to the validity of an agreement and specifically allows evidence of fraud." (*Riverisland*, at pp. 1175, 1182.) The rule had long been criticized and "detours" had been developed to avoid applying it. (*Id*. at pp. 1176–1179.) A retroactive application is hardly unfair, and *Riverisland* already has been applied retroactively. (See *Thrifty Payless, Inc. v. The Americana at Brand, LLC* (2013) 218 Cal.App.4th 1230, 1240; *Julius Castle Restaurant, Inc. v. Payne* (2013) 216 Cal.App.4th 1423, 1426.)

But we agree with respondents' alternative argument that *Riverisland* is not dispositive because the trial court did not exclude evidence of fraud in the inducement of the release. Rather, it relied on *Village Northridge Homeowners Assn. v. State Farm Fire & Casualty Co.* (2010) 50 Cal.4th 913 (*Village Northridge*), to rule that Bio-Tek could not sue for damages without first rescinding the release and returning the consideration received under the contract with Centennial.

## B. Rescission

In *Village Northridge*, *supra*, 50 Cal.4th 913, the court held that "a release of a disputed claim . . . does not permit a party to elect the remedy of a suit for damages when the release itself bars that option. Instead, the . . . party to the release must follow the rules governing rescission of that release before suing . . . for damages." (*Id*. at 918.) Bio-Tek did not follow the rules governing rescission of the release. To effect a rescission, a party to a contract must give prompt notice to the other party and offer to

8

restore any consideration received. (Civ. Code, § 1691.) "When notice of rescission has not otherwise been given or an offer to restore the benefits received under the contract has not otherwise been made, the service of a pleading in an action or proceeding that seeks relief based on rescission shall be deemed to be such notice or offer or both." (*Ibid*.) Although it claims to have rescinded the release, Bio-Tek did not give the statutorily required notice of its intent to rescind. The second amended complaint does not mention the release, allege fraud in the inducement, or seek rescission. (Cf. *Village Northridge*, at p. 920 [plaintiff did not allege fraud in the inducement or rescission].)

Instead, in its opposition to the summary judgment motion, Bio-Tek relied on *Persson v. Smart Inventions, Inc.* (2005) 125 Cal.App.4th 1141 (*Persson*) to argue that the court had equitable power to set aside the release. In *Persson*, a shareholder was fraudulently induced to sell his shares to another shareholder for less than their market value in a buyout agreement that included a mutual release. (*Id*. at pp. 1149–1150.) The court held the release was not an essential object of the contract, and setting it aside would not constitute partial rescission. (*Id*. at p. 1154.) The plaintiff thus could affirm the contract and sue for fraud despite the release of unknown claims. (*Id*. at p. 1154.) Similarly, in *Sime v. Malouf* (1949) 95 Cal.App.2d 82, 112–113 (*Sime*), on which Bio-Tek also relies, a general release of all claims as part of a fraudulently induced sale of the plaintiff's interest in a joint venture did not preclude a suit for damages. Nor was the plaintiff required to rescind the sale and restore the consideration he received because his right to it was independent of the release. (*Id*. at p. 111.)

Bio-Tek's reliance on *Persson*, *supra*, 125 Cal.App.4th 1141, and *Sime*, *supra*, 95 Cal.App.2d 82, is misplaced. Under *Village Northridge*, *supra*, 50 Cal.4th 913, the "general contract rule that a party to a contract may elect to affirm the contract and sue for fraud damages" does not apply to the release of a disputed claim. (*Id*. at p. 917.) Unlike the general releases of unknown claims included in the sales contracts in *Persson* and *Sime*, the release of Bio-Tek's claims against QDU was of a specific disputed claim: Bio-Tek claimed QDU had fraudulently cut it out of the deal with Colonial, whereas QDU maintained it could not legally contract with Bio-Tek. The sole purpose of the

9

release was to "buy peace" by freeing QDU from the threat of suit by Bio-Tek if QDU contracted with Colonial. (See *Village Northridge*, at p. 924.)

Bio-Tek argues it is not required to restore the compensation it received from Centennial because it was earned for services actually provided and did not come from QDU. The MOU and contract with Centennial were, at least in part, intended to be consideration for the release of QDU. Therefore, the compensation Bio-Tek received from Centennial was not "wholly 'independent[] of the release itself.'" (*Village Northridge*, *supra*, 50 Cal.4th at p. 925, quoting *Sime*, *supra*, 95 Cal.App.2d at p. 111.) But restoration is not the real issue here. When a party sues for rescission of a release under the statutory scheme (Civ. Code, §§ 1691–1693), it may delay restoration of the consideration it received until final judgment, at which point the court may adjust the equities between the parties. (*Village Northridge*, at pp. 928–929; see also 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 942, p. 1036.) Bio-Tek did not sue for rescission; as the plaintiff did in *Village Northridge*, Bio-Tek relied on the "affirm and sue" strategy that was rejected in that case. (See *id*. at p. 929.)

According to Bio-Tek, even if the release is set aside, there is no legal basis for rescinding the contract with Centennial to which QDU was not a party. The release was an essential component of the entire deal because, by its own terms, it was an external condition precedent for QDU's contract with Colonial, which in turn was an external condition precedent for Bio-Tek's contract with Centennial under the MOU. (See 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 136, p. 176 [parties may agree that contract will not become binding until the occurrence of some event, an external condition precedent to contract effectiveness].) Without the release, there would have been no binding contract between QDU and Colonial, and none between Bio-Tek and Centennial. Had Bio-Tek rescinded the release in time, the rescission would have provided a basis for QDU to rescind its contract with Colonial, and Centennial's contract with Bio-Tek would have been void.

Respondents argue that when given a chance to rescind the release, Bio-Tek and Omari did nothing and instead proceeded with the deal. Bio-Tek responds that Omari

10

signed the agreement with Centennial only in 2008 and that by then Jamal had "lulled" him into a sense of security with promises to "'make it right'" by working with Bio-Tek on future projects.  In essence, respondents argue that Bio-Tek waived its right to rescind, and Bio-Tek argues that any such waiver was fraudulently induced.

Waiver of a right to rescind is presumed when a party, "having full knowledge of the circumstances which would warrant" rescission, "accepts and retains benefits" under the contract.  (*Saret-Cook v. Gilbert, Kelly, Crowley & Jennett* (1999) 74 Cal.App.4th 1211, 1225; see also Civ. Code, § 1691 [party must promptly rescind upon discovering "the facts which entitle him to rescind if he is free from duress, menace, undue influence or disability and is aware of his right to rescind"].)  A fraudulently induced waiver, however, is ineffective.  (*Channell v. Anthony* (1976) 58 Cal.App.3d 290, 304–305.)

The trial court observed that the same fraudulent acts alleged to have occurred before the release were repeated after it and therefore were not separately actionable.  Bio-Tek's position essentially is that QDU defrauded it repeatedly by promising and then refusing to contract with it.  Justifiable reliance on a misrepresentation is a necessary element of fraud.  (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239.)  Although the reasonableness of a party's reliance normally is an issue of fact, reliance is unjustifiable as a matter of law if the party's conduct, in light of his or her own knowledge, experience and available information, is manifestly unreasonable.  (*Id*. at p. 1240.)

There is no evidence Jamal misled Omari about Bio-Tek's right to rescind.  Rather, Omari claims to have decided to forego his right to rescind in reliance on Jamal's vague promises of future contracts.  Omari did so even though he knew QDU already had reneged on its earlier promises to work with and pay Bio-Tek on the CDCR contract and even though he already felt "scammed" and "betrayed."  He decided to go along with a deal in which he claims to have been defrauded twice in hopes that those who defrauded him would treat him better in the future.  In light of his knowledge and experience, Omari's reliance was objectively unreasonable.  He waived his right to rescind the release by his acquiescence.

11

*C. Lack of Signature and Consideration*

Bio-Tek claims the release fails for lack of consideration and is unenforceable because Gallego did not countersign it. We disagree.

A written release requires no consideration. (Civ. Code, § 1541; *Cohn v. Bugas* (1974) 42 Cal.App.3d 381, 390.)

The signature of the released party is not essential unless the parties intended it to be. (*Hofland v. Gustafson* (1955) 132 Cal.App.2d Supp. 907, 909.) Any language to that effect "'is to be considered in the light of the surrounding circumstances and of the practical and mutual construction placed thereon as shown by their acts and conduct before any controversy has arisen between them. [Citation.]' [Citation.]" (*Rael v. Davis* (2008) 166 Cal.App.4th 1608, 1618, fn. 12.) As a rule, "'the receipt and acceptance by one party of a paper signed by the other only, and purporting to embody all the terms of a contract between the two, binds the acceptor, as well as the signer, to the terms of the paper. [Citations.]'" (*Dallman Supply Co. v. Smith-Blair, Inc.* (1951) 103 Cal.App.2d 129, 132.) It is true that Gallego did not sign the release even though space for his signature was expressly included. But QDU accepted the release and acted upon it by entering into a contract with Colonial, for which the release was a pre-condition.

The release is valid and bars Bio-Tek's claims as a matter of law. Summary judgment was proper.

## DISPOSITION

The judgment is affirmed. Respondents are entitled to their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EPSTEIN, P. J.

We concur:


WILLHITE, J.                          MANELLA, J.

12